UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 15-56916-BEM |
| FACTEON, LLC, | ) | Chapter 11 |
| | ) | |

**JOINT PLAN OF REORGANIZATION FOR FACTEON, LLC PROPOSED BY
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF FACTEON, LLC AND FACTEON, LLC**

M. Denise Dotson
M. DENISE DOTSON, LLC
170 Mitchell Street
Atlanta, Georgia 30303
*Attorney for Facteon, LLC*

JOHN A. CHRISTY
SCHREEDER, WHEELER & FLINT, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
*Attorney for the Official Committee of
Unsecured Creditors of Facteon, LLC*

Atlanta, Georgia
September 15, 2015

PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, NOTHING CONTAINED IN THIS PLAN SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THIS PLAN UNTIL SUCH TIME AS THE DISCLOSURE STATEMENT (AS DEFINED IN THIS PLAN) HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION, AND DISTRIBUTED, WITH APPROPRIATE BALLOTS, TO ALL HOLDERS OF IMPAIRED CLAIMS AGAINST AND  IMPAIRED INTERESTS IN THE DEBTOR ENTITLED TO VOTE ON THIS PLAN. THE PROPONENTS RESERVE THE RIGHT TO FILE AN AMENDED OR AMENDED AND RESTATED PLAN AND DISCLOSURE STATEMENT FROM TIME TO TIME. REFERENCE IS MADE TO THE DISCLOSURE STATEMENT FOR A DISCUSSION OF VOTING INSTRUCTIONS, THE DEBTOR'S HISTORY, BUSINESS, PROPERTIES, AND RESULTS OF OPERATIONS, A SUMMARY OF SIGNIFICANT EVENTS WHICH HAVE OCCURRED TO DATE IN THE REORGANIZATION CASE, AND THE MEANS OF FUNDING THIS PLAN.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THIS PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS PLAN AND THE DISCLOSURE STATEMENT WILL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

## INDEX OF EXHIBITS TO PLAN

EXHIBIT A-1      List of Noteholders and amounts for the purposes of the Plan

EXHIBIT A-2      List of Unsecured Creditors other than Noteholders and amounts

EXHIBIT B-1      Amended and Restated Operating Agreement of Facteon, LLC

EXHIBIT B-2      Operating Agreement of Facteon Holdings, LLC

EXHIBIT B-3      Operating Agreement of Facteon Asset Recovery, LLC

EXHIBIT B-4      Amended and Restated Operating Agreement of Comply First, LLC

EXHIBIT C       Executory Contracts and Unexpired Leases to be Assumed

## INTRODUCTION

Facteon, LLC,  the Debtor and Debtor in Possession in this Reorganization Case (the "Debtor,"), and the Official Committee of Unsecured Creditors of Facteon, LLC appointed by the Bankruptcy Court in this Reorganization Case (the "Creditors Committee"), hereby  jointly propose and file the following Joint Plan of Reorganization (the "Plan"). This Plan should be considered in conjunction with the Disclosure Statement (the "Disclosure Statement"), which the Debtor and the  Creditors Committee (collectively,  the  "Plan Proponents")  have filed contemporaneously herewith, for (a) a discussion of the Debtor's history, business, properties, and results of operations; (b) a summary of significant events which have occurred to date in this Reorganization Case; (c) a summary of the means of funding the Plan; and (d) the procedures for voting on the Plan. All Holders of Claims against and Equity Interests in the Debtor entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.

No materials other than the Disclosure Statement and any exhibits and schedules attached to or referenced in the Disclosure Statement have been approved by the Bankruptcy Court or the Proponent for use in soliciting acceptances or rejections of the Plan.

NOTWITHSTANDING ANYTHING IN THIS PLAN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTOR'S BUSINESS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTOR, TRANSACTIONS TO WHICH THE DEBTOR WAS OR IS A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON SECURED CREDITORS, UNSECURED CREDITORS, OR HOLDERS OF INTERESTS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTOR AND NOT TO ANY OTHER PARTY.

**Article 1**
**DEFINED TERMS**

The following terms, which appear in this Plan as capitalized terms, have the meanings set forth below:

**1.01** "*Administrative Expense*" means-

(a) any cost or expense of administration of the Reorganization Case that is allowed under Section 503(b) or 507(a)(l) of the Bankruptcy Code, to the extent the party claiming any such Administrative Expense files an application or other Bankruptcy Court-approved pleading seeking such expense in the Reorganization Case on or before the applicable Administrative Expense Claims Bar Date, including –

(1) any actual and necessary costs and expenses of preserving the Estate or operating the business of the Debtor (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date;

(2) any Postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in Possession in the ordinary course of its businesses (including any Postpetition Trade Claim);

(3) any payment required to be made to cure a default under an Assumed Contract, including any Cure Claim, to the extent allowed by a Final Order of the Bankruptcy Court;

(4) any Claim granted administrative-expense priority status by a Final Order of the Bankruptcy Court;

(5) any Claim by a Governmental Authority for non-ad valorem taxes that are assessed in *personam* (and for interest and/or penalties related to such taxes) for any tax year or period, to the extent such Claim accrues Postpetition; and

(6) any Compensation Claim;

(b) any superpriority Claim;

(c) all fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§ 1911-1930; and

(d)      any and all other costs ·or expenses of administration of the Reorganization Case that are allowed by Final Order of the Bankruptcy Court.

The terms "Administrative Expense" and "Administrative Expense Claim" do not include any Priority Tax Claim, any Priority Claim, any Disallowed Claim, or any of the Claims designated in Classes under the Plan. In no event shall any Claim set forth on a Proof of Claim (or otherwise) be deemed to be an Administrative Expense Claim (except for any claim by a governmental unit for taxes (and for interest and/or penalties related, to such taxes) due from the Debtor for any Postpetition tax year or period).

**1.02** *"Administrative Expense Claim"* means any Claim for the payment of an Administrative Expense. The terms "Administrative Expense(s)," "Administrative Claim(s)," and "Administrative Expense Claim(s)" are used interchangeably in this Plan.

**1.03** *"Administrative Expense Bar Date"* means, subject to §3.04 of this Plan, the date ordered by the Bankruptcy Court or the date established by the Bankruptcy Rules as the last day for filing an application or other Bankruptcy Court-approved pleading for an Administrative Expense. In the case of an Administrative Expense deemed to arise after the date ordered by the Court or established by the Bankruptcy Rules, the Administrative Expense Bar Date will be thirty (30) days after the Effective Date.

**1.04** *"Affiliate"* has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

**1.05** *"Allowed Amount"* means the dollar amount in which a Claim is Allowed.

**1.06** *"Allowed Claim"* means a Claim or that portion of a Claim that is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date, or, by order of the Bankruptcy Court, was not required to be filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date, but which has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) or (b) above, as to which either (x) no objection to the allowance thereof has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) any objection made has been determined and the Claim has been allowed by a Final Order (but only to the extent so allowed). "Allowed Claim" will also include a Claim that is allowed by the Bankruptcy Court (a) in any contract, instrument, or other agreement or document entered into in connection with the Plan; (b) in a Final Order; or (c) pursuant to the terms of the Plan. "Allowed," when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim) has a corresponding meaning.

**1.07** *"Allowed Class ... Claim"* means an Allowed Claim in the particular Class(es) or categories described.

**1.08** *"Assumed Contract"* means any Executory Contract or Unexpired Lease assumed by the Debtor in the Reorganization Case pursuant to a Final Order of the Bankruptcy Court, including but not limited to the Confirmation Order confirming the Plan once it becomes a Final Order.

**1.09** *"Ballot"* means the ballot accompanying the Disclosure Statement upon which Holders of Impaired Claims or Impaired Interests entitled to vote on the Plan will indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

**1.10** *"Bankruptcy Code" or "Code"* means Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.), as in effect on the Petition Date, together with all amendments  and modifications to the Code that were subsequently made applicable to the Reorganization Case.

**1.11** *"Bankruptcy Counsel"* means M. Denise Dotson, LLC, in its Bankruptcy Court-approved capacity as Chapter 11 bankruptcy counsel to the Debtor.

**1.12** *"Bankruptcy Court"* means the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Reorganization Case.

**1.13** *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court (N.D. Ga. L.B.R.), as in effect on the Petition Date, together with all amendments and modifications to the Bankruptcy Rules that were subsequently made applicable to the Reorganization Case.

**1.14** *"Bar Date"* means the bar date(s) established by the Bankruptcy Court from time to time as the last day for filing Proofs of Claim against, or proofs of Interest in, the Debtor, including with respect to executory contracts and unexpired leases that are rejected pursuant to the Plan, pursuant to a Final Order of the Bankruptcy Court or otherwise pursuant to Section 365 of the Bankruptcy Code; provided, however, that, when used  in the Plan, the term "Bar Date" shall not include the Administrative Expense Claims Bar Date. Unless otherwise specified by Final Order of the Bankruptcy Court, the Bar Date means July 1, 2015 (as fixed by the Bar Date Order).

**1.15** *"Bar Date Order"* means, as the context may require, either (a) the order entered by the Bankruptcy Court on May 8, 2015, establishing a Bar Date of July 1, 2015 [Doc. No. 31], or (b) the applicable order entered by the Bankruptcy Court establishing an Administrative Expense Claims Bar Date.

**1.16** *"Business Day"* means any day other than a Saturday, Sunday, "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or day on which weather or other conditions have made the Clerk's office inaccessible.

**1.17** *"Cash"* means Cash, Cash equivalents, and other readily marketable direct obligations of the United States of America, as determined in accordance with Generally Accepted Accounting Principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a distribution under the Plan, the term "Cash" means lawful currency of the Unite States of America, a certified check, a Cashier's check, a wire transfer of immediately available funds from any source,  or  a check  from the Debtor drawn on a domestic bank.

**1.18** *"Causes of Action"* means any and all of the Estate's and the Debtor's actions, claims, demands, rights, defenses, counterclaims, suits, causes of action, liabilities, obligations, debts, judgments, remedies, damages, recoupments, cross claims, counterclaims,  third-party claims, indemnity claims, contribution claims, and  any other claims, whether known or unknown, foreseen or unforeseen,  direct or indirect/derivative, choate or inchoate in law, equity or otherwise, including all avoidance actions and rights to recover transfers voidable or recoverable under Sections 502, 542, 543, 544, 545, 547, 548, 549, 550, 551, and/or 553 of the Bankruptcy Code, and any and all other claims or rights of any value whatsoever, at law or in equity, against any Creditor or other third party, including any and all claims against any members, officers, directors, managers or employees of the Debtor and including claims of the type referred to in the Disclosure Statement; provided, however, that, when used in the Plan, the term "Causes of Action" does not include any Claims, obligations, suits, judgments, damages, rights, remedies, Causes of Action, charges, costs, Debts, indebtedness, or Liabilities which are released or waived pursuant to Article 11 of the Plan or by order of the Bankruptcy Court. Some of the Causes of Action may be described in further detail in the Disclosure Statement. A Cause of Action will not under any circumstances be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or the Disclosure Statement.  Causes of Action shall include, but not be limited to, those payments and other transactions identified in the Schedules.

**1.19** *"Claim"* has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, when used in the Plan, the term "Claim" will be given the broadest possible meaning permitted by applicable law and will include all manner and type of claim, whenever and wherever such claim may arise.

**1.20** *"Class"* means a category of Claims or Equity Interests classified together as described in Article 4 of the Plan, pursuant to Section 1122(a) of the Bankruptcy Code.

**1.21** *"Clerk"* means the Clerk of the Bankruptcy Court.

**1.22** *"Confirmation" or "Confirmation of the Plan"* means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

**1.23** *"Confirmation Date"* means the date on which the Confirmation Order is entered on the Docket pursuant to Bankruptcy Rule 5003(a).

**1.24** *"Confirmation Hearing"* means the hearing(s) held by the Bankruptcy Court pursuant to Section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

**1.25** *"Confirmation Order"* means the order entered by the Bankruptcy Court in the Reorganization Case confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, which order will be in form and substance reasonably satisfactory to the Debtor and the Creditors Committee, and will include any amendments, supplements or modifications thereto made with the consent of the Debtor and the Creditors Committee, or as determined by the Bankruptcy Court.

**1.26** *"Consummation Date"* shall mean the date on which the Debtor makes the final Distribution of the Liquidation Proceeds in accordance with the Plan.

**1.27** *"Creditor"* means the Holder of a Claim, within the meaning of Claims 101(10) of the Bankruptcy Code, including Creditors with Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, and any other Claims classified in the Plan.

**1.28** *"Creditors Committee" or "Committee"* means the Official Committee of Unsecured Creditors of Facteon, LLC, appointed by the United States Trustee in the Reorganization Case pursuant to Section 1102 of the Bankruptcy Code, as the membership of such committee has been or may be modified by the United States Trustee.

**1.29** *"Cure Claim"* means any Claim of any nature whatsoever, including any Claim for any cure payment, cost or other amount, if any, due and owing by the Debtor pursuant to Section 365(b) of the Bankruptcy Code or otherwise, and any Claim for a default (monetary or nonmonetary) arising from, relating to, or in connection with the assumption by the Debtor of any Assumed Contract.

**1.30** *"Cure Claim Submission Deadline"* means and shall occur on the same day as the Voting Deadline.

**1.31** *"Debt"* has the meaning ascribed to such term in Section 101(12) of the Bankruptcy Code.

**1.32** *"Debtor"* or "Facteon" means Facteon, LLC.

**1.33** *"Debtor in Possession"* means Facteon, LLC, as Debtor in Possession in the Reorganization Case.

**1.34** *"Designated Notice"* means notice and an opportunity for a hearing as defined in Section 102(a) of the Bankruptcy Code, with notice limited to the Debtor, the United States Trustee, and the Committee, or their respective counsel, and other parties in interest who, after entry of the Confirmation Order, file a request for such notice with the clerk of the Court and serve a copy of such notice on counsel to the Debtor and the Committee.

**1.35** *"Disallowed Claim"* means any Claim that has been disallowed by a Bankruptcy Court order that has not been stayed pending appeal.

**1.36** *"Disclosure Statement"* means the Disclosure Statement for the Plan, including all attached exhibits, appendices, and schedules, as submitted and filed by the Debtor pursuant to Section 1125 of the Bankruptcy Code in respect of the Reorganization Case and approved by the Bankruptcy Court in the Disclosure Statement Approval Order, as such Disclosure Statement has been and may be amended, supplemented, modified, or amended and restated from time to time.

**1.37** *"Disclosure Statement Approval Order"* means the Order Approving Disclosure Statement entered in the Reorganization Case.

**1.38** *"Disputed Claim"* means:

(a) any Claim (other than a Disallowed Claim) that has not been Allowed by an order of the Bankruptcy Court as to which:

(1) a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court and

(2) an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been

(A) withdrawn,

(B) overruled or denied by an order of the Bankruptcy

Court, or

    (C)  sustained by an order of the Bankruptcy Court.

  (b)  a Claim that has not been Allowed by an order of the Bankruptcy Court, whether or not an objection has been or may be timely filed, if:

    (1)  the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules,

    (2)  the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules,

    (3)  any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated,

    (4)  no corresponding Claim has been scheduled in the Schedules, or

    (5)  the Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect of the Claim.

  (c)  to the extent that an objection relates to the allowance of only a part of a Claim, the Claim to the extent of the objection, or

  (d)  to the extent that the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, the amount specified in the Proof of Claim that is in excess of the amount of the Claim as scheduled.

  **1.39**  *"Distribution"* shall mean Cash, property, interests in property or other value distributed under this Plan to the Holders of Allowed Claims.

  **1.40**  *"Distribution Date"* shall mean shall mean any date that the Debtor, in its sole discretion, with the approval of the Creditors Committee deems it appropriate to make a Distribution or payment to holders of Allowed Claims.

  **1.41**  *"Docket"* means the docket or dockets in the Reorganization Case maintained by the Clerk.

  **1.42**  *"Effective Date"* means and will occur on the date that the Debtor files the

certificate of Effective Date, but in any event no earlier than the first Business Day following the Confirmation Date on which all of the conditions to the occurrence of the Effective Date contained in Article 10 of the Plan have been satisfied (as determined by the Debtor and the Creditors Committee) or waived by the Debtor and the Creditors Committee as provided in §10.03 of the Plan and the Confirmation Order has become final with all appeals periods having passed and there being no unresolved appeal.

**1.43** *"Entity"* has the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code.

**1.44** *"Equity Interests" or "Interests"* means the one-hundred (100%) percent of the membership interests in the Debtor.

**1.45** *"Estate"* means the Estate created for the Debtor under Section 541 of the Bankruptcy Code upon the commencement of the Reorganization Case.

**1.46** *"Estimation Hearing"* means a hearing for the estimation of Claims under Section 502(c) of the Bankruptcy Code.

**1.47** *"Executory Contract"* means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including, without limitation, the License Agreements and the Franchise Agreements.

**1.48** *"Facteon Holdco"* shall mean Facteon Holdings, LLC.

**1.49** *"Final Decree"* means the Final Order of the Bankruptcy Court entered pursuant to Bankruptcy Rule 3022 decreeing that the Estate has been fully administered.

**1.50** *"Final Decree Date"* means the date on which a Final Decree has been entered.

**1.51** *"Final Order"* means –

(a) an order, judgment, ruling, or other decree (or any revision, modification, or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court that has jurisdiction over any proceeding in connection with the Reorganization Case for the purpose of such proceeding, which order, judgment, ruling, or other decree has not been reversed, vacated, stayed, modified, or amended and as to which:

(1) no appeal, 'petition for review, reargument, rehearing, reconsideration, or certiorari has been taken and is pending and the time for the filing of such appeal, petition for review, reargument, rehearing,

reconsideration, or certiorari has expired, or

(2)    such appeal or petition has been heard and dismissed   or resolved and the time to further appeal or petition has expired with no further appeal or petition pending; or

(b)    a stipulation or other agreement entered into which has the effect of any such order, judgment, ruling, or other decree with like finality.

**1.52**   *"Governmental Authority"* means any agency, board, bureau, executive, court, commission, department, legislature, tribunal, instrumentality, or administration of the United States, a foreign country, or any state, or any provincial, territorial, municipal, state, local, or other governmental Entity in the United States of America or a foreign country.

**1.53**   *"Holder"* means:

(a)    as to any Claim:

(1)    the owner or Holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim;

(2)    if no Proof of Claim has been filed with respect to such Claim, the owner or Holder of such Claim as shown on the Schedules or books and records of the Debtor or as otherwise determined by order of the Bankruptcy Court; or

(3)    if the owner or Holder of such Claim has transferred the Claim to a third  party, advised  the  Debtor  or Debtor  in  writing   of such  transfer and transferee,  and filed notice of the transfer  and transferee with the   Clerk of the Bankruptcy Court as required by Bankruptcy Rule 3001(e); and

(b)    as to any Equity Interest, all owners of Equity Interests as of the Confirmation Date.

**1.54**   *"Impaired"* means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.55**   *"Insurance Coverage"* means any insurance coverage under any Insurance Policy that is available for the payment of liability or damages arising out of any claim against the Debtor or any officer, directors, manager or employee of the Debtor.

**1.56** *"Insurance Policy"* means any insurance policy in effect at any time on or before the Effective Date owned by the Debtor and/or naming the Debtor as an insured or additional insured, or otherwise affording the Debtor Insurance Coverage.

**1.57** *"Intellectual Property"* means any interest of the Debtor or the Estate in Property consisting of general intangibles, intellectual property, trademarks, tradenames, goodwill, training materials, web addresses and domain names relating to the business conducted by the Debtor.

**1.58** *"Liabilities"* means any and· all liabilities, obligations, judgments, damages, charges, costs, Debt, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now, or hereafter owing, arising, due, or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, of or relating to the Debtor, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective  Date in any way relating to the Debtor or any predecessor, successor, or assign thereof, the Property, the business or operations of the Debtor, the Reorganization Case, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, as used in the Plan, the term "Liabilities" does not include any post confirmation or post Effective Date payment obligation expressly set forth and preserved in the Plan.

**1.59** *"Lien"* has the meaning ascribed to it in section 101(37) of the Bankruptcy Code and, with respect to any asset or Property, includes any mortgage, pledge, security interest, lien, right of first refusal, option, or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such asset or  Property, whether voluntary or involuntary and whether arising by law, contract, or otherwise. Any lien avoided in accordance with Sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall not constitute a Lien.

**1.60** *"New Equity Interests"* means one-hundred (100%) percent of the equity interests in Facteon Holdco and the Debtor, to be issued on or before the Effective Date, in accordance with the Plan, Section 1145 of the Bankruptcy Code, and the Facteon Holdco Operating Agreement and the Amended and Restated Operating Agreement of the Debtor.

**1.61** *"Noteholders"* means those creditors  and in the amounts listed in **Exhibit A-1** to this Plan.

**1.62** *"Person"* means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency, or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

**1.63** *"Petition Date"* means April 14, 2015, the date on which the Debtor filed its voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

**1.64** *"Plan," "the Plan," or "this Plan"* means the Plan of Reorganization proposed by the Debtor and the Creditors Committee dated August ___, 2015 (together with all Exhibits to the Plan), as the Plan may be amended, supplemented, modified, or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

**1.65** *"Plan Documents"* means all documents that aid in effectuating the Plan, including, without limitation, all documents filed with the Bankruptcy Court at or before the Confirmation Hearing, and including the Facteon Holdco Operating Agreement.

**1.66** *"Postconfirmation"* means arising or accruing on or after the Confirmation Date and before the Effective Date.

**1.67** *"Postpetition"* means arising or accruing on or after the Petition Date and before the Effective Date.

**1.68** *"Postpetition Trade Claims"* shall mean Administrative Claims incurred Postpetition in the ordinary course of business of the Debtor (such as trade and vendor claims), on ordinary course business terms, and which are unrelated to the administration of the bankruptcy estate, exclusive of any obligations to employees of the Debtor.

**1.69** *"Prepetition"* means arising or accruing prior to the Petition Date.

**1.70** *"Priority Claim"* means a Claim that is entitled to a priority in payment pursuant to subparagraphs (3) through (7) or subparagraph (9) of Section 507(a) of the Bankruptcy Code and that is not an Administrative Expense Claim, Priority Tax Claim, Secured Claim, or Unsecured Claim.

**1.71** *"Priority Tax Claim"* means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Expense, Secured Claim, or Unsecured Claim.

**1.72** *"Proponents"* mean the Debtor and the Creditors Committee, as the

proponents of the Plan.

**1.73** *"Pro Rata Share"* means, with respect to any distribution to the Holder of an Allowed Claim in a particular Class or otherwise, a fraction, the numerator of which will be the amount of such Holder's Allowed Claim and the denominator of which will be the sum of all Allowed Claims and all Disputed Claims in such Class and, if applicable, other Classes. The term "Pro Rata Share" will also be applied in respect of Administrative Expenses, Priority Tax Claims, and Priority Claims, as the context requires in the Plan.

**1.74** *"Professional"* means any professional employed in the Reorganization Case with the approval of the Bankruptcy' Court pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code.

**1.75** *"Proof of Claim"* means a proof of claim filed with the Bankruptcy Court with respect to the Debtor pursuant to Bankruptcy Rules 3001, 3002, or 3003 in accordance with various orders of the Bankruptcy Court.

**1.76** *"Property"* means any property or asset of any kind in which the Debtor or the Estate holds an interest, whether real, personal or mixed, tangible or intangible, whether now owned or hereafter acquired or arising, and wherever located, and any interest of any kind in such property or asset.

**1.77** "*Recovery from BMMP*" means  any amounts received through litigation on account of the claim against Birnbrey, Minsk, Minsk & Perling, LLC  filed by the Committee and the Debtor in the Superior Court of Fulton County, Case No. 2015-cv-260135.

**1.78** "*Released Parties*" means the Debtor, the Creditors Committee and their respective attorneys, accountants, and Professionals (acting in such capacity) but only with respect to acts and occurrences in the scope as  described in Article 11 of the Plan.

**1.79** "*Reorganization Case*" or "*Case*" means the Debtor's Chapter 11 case identified according to the following bankruptcy case number, Chapter 11 Case No. 11-68463.

**1.80** "*Schedules*" means, collectively, the Schedules and Statements of Financial Affairs filed by the Debtor in the Reorganization Case on July 15, 2015 (Docket  No.  40) pursuant to Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended or supplemented from time to time.

**1.81** "S*ection 6621 Interest Rate*" shall mean the rate of interest charged by the United States for delinquent tax obligations pursuant to 26 U.S.C. § 6621.

**1.82** *"Subordinated Claims"* means Claims against the Debtor that are subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

**1.83** *"Taxes"* means all (i) federal, state, local or foreign taxes, including, without limitation, all net income, alternative minimum, net worth or gross receipts, sales, capital, value added, franchise, profits and estimated taxes and (ii) interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Authority or paid in connection with any item described in clause (i) hereof.

**1.84** *"Unclaimed Property"* means any funds payable to holders of Claims which are unclaimed. Unclaimed Property shall include (a) checks (and the funds represented  thereby) which have been returned as undeliverable without a proper forwarding address, (b) funds for checks which have not been presented and paid within ninety (90) days of their issuance, (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a proper address to mail or deliver such property and (d) checks (and the funds represented thereby) which are not mailed due to the lack of required tax identification information, but only following two mailed requests for this tax identification information.

**1.85** *"Unexpired Lease"* means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.86** *"Unimpaired Claim"* means a Claim that is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.87** *"United States Trustee"* means the United States Trustee for Region 21, and the Office of the United States Trustee located in Atlanta, Georgia.

**1.88** *"Unsecured Claim"* means any Claim that is not an Administrative Expense, Priority Tax Claim, Priority Claim, Secured Claim, Intercompany Claim, or Convenience Class Unsecured Claim, including (a) any Claim arising from the rejection of an Executory Contract or Unexpired Lease under Section 365 of the Bankruptcy Code and (b) any portion of a Claim to the extent the value of the Holder's interest in the Estate' interest in the Property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Section 506(a) of the Bankruptcy  Code.

**1.89** *"Unsecured Creditor"* means any Creditor holding an Unsecured Claim.

**1.90** *"Voting Deadline"* means the date established by the Bankruptcy Court for the filing of Ballots to accept or reject the Plan.

**Article 2**
**CONTROLLING LAW AND RULES OF CONSTRUCTION**

**2.01**   ***Reference to Bankruptcy Code and Bankruptcy Rules.***   Any capitalized term utilized in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**2.02**   ***Rules of Construction.***   For purposes of the Plan, the following rules   of construction apply:

(a)     Captions and headings in the Plan are for convenience and reference only and shall not have any effect on the interpretation of any provision of the Plan.

(b)     Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, includes both the singular and the plural.

(c)     Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document will be  substantially in such form  or substantially on such terms and conditions.

(d)     Any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented.

(e)     If the description in the Plan of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control.

(f)     Unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan.

(g)     All of the Exhibits referenced in or referred to in the Plan will be deemed incorporated herein by such reference and made a part hereof for all purposes.

(h)     Unless the context requires otherwise, the words "herein," "hereunder," and "hereto" refer to the Plan in its entirety rather than to a particular article or section or subsection of the Plan.

(i)    Any phrase containing the term "include" or "including" means including without limitation.

(j)    The rules of construction set forth in 11 U.S.C. § 102 shall apply in the construction of the Plan to the extent that such rules are not inconsistent with.

(k)    any other provision of this §2.02 of the Plan.

## Article 3
## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

**3.01    *Nonclassiflcation.*** In accordance with Section   1123(a)(l) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified in the Plan. The treatment accorded to Administrative Expenses and Priority Tax Claims is  set  forth  in  this Article 3.

**3.02    *Administrative Expenses.*** Except as otherwise provided below and in § 3.05 of the Plan, on or before the later to occur of the Effective Date or entry of a Final Order Allowing the Claim, each Holder of an Allowed Administrative Expense Claim (other than Postpetition Trade Claims) shall be paid by the Debtor from the Postconfirmation Distribution  Fund  an amount, in Cash, equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code. Notwithstanding the foregoing, each Holder of an Allowed Administrative Expense Claim may be paid (a) on such other terms as may be agreed upon by the Holder of such Allowed  Administrative Expense Claim and the Debtor or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

**3.03    *Fees and Charges.*** All fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§1911-1930, which are incurred but unpaid for all periods through the Effective Date, will be paid on the Effective Date by the Debtor.

**3.04    *Applications for Allowance of Administrative Expenses.*** All Holders of Administrative Expenses (including Holders of any Claims for non-ad valorem Postpetition federal, state, or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Administrative Expense Bar Date will be forever barred from asserting such Administrative Expense against the Debtor or its Estate.

**3.05    *Priority Tax Claims.*** Each Holder of an Allowed Priority Tax Claim shall

receive on account of such Allowed Priority Tax Claim regular quarterly installment payments in Cash from the Debtor in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Holders of Allowed Priority Tax Claims shall receive interest on account of their Allowed Priority Tax Claims at the Section 6621 Interest Rate; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. Notwithstanding the foregoing, each Holder of an Allowed Priority Tax Claim may be paid (a) on such other terms as may be agreed upon by the Holder of such Allowed Priority Tax Claim and the Debtor or (b) as otherwise ordered by a Final Order of the Bankruptcy Court. Each holder of a Priority Tax Claim shall credit toward said Claim, dollar-for-dollar, any payment of any part of said Claim to the extent the same is paid by some third-party. The Debtor may prepay in whole or part any Priority Tax Claim at any time, without interest or penalty, at which time such Allowed Priority Tax Claim shall not be entitled to any further distributions.

## Article 4
## DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS

**4.01    *In General.*** Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests. A Claim or Equity Interest is classified (a) in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and (b) in a different Class to the extent the Claim or Equity Interest qualifies within the description of that different Class. Unless otherwise expressly stated, the Classes of Claims set forth below include all Claims that qualify within the description of that Class. As of the Confirmation Hearing, any Class of Claims which does not contain any Creditor's Claims will be deemed deleted automatically from the Plan, and any Class of Claims which does not contain an Allowed Claim (or a Claim temporarily or provisionally Allowed by the Bankruptcy Court for voting purposes) will be deemed automatically deleted from the Plan with respect to voting on confirmation of the Plan.

**4.02**    Classes. For the purposes of this Plan, Claims and Equity Interests are classified as follows:

(a)     Class 1 consists of all Priority Claims.

(b)     Class 2 consists of all Postpetition Trade Claims.

(c)     Class 3 consists of Allowed Claim(s) of Noteholders as set out in **Exhibit A-1** to the Plan.

(d)     Class 4 consists of all Allowed Unsecured Claims other than

Noteholders.

(e)     Class 5 consists of all Equity Interests in the Debtor.

## Article 5
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**5.01     *In General.*** Claims and Equity Interests will be treated under the Plan in the manner set forth in this Article 5. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan will be in full and final satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims, of any nature whatsoever, and Allowed Equity Interests.

**5.02     *Unclassified Claims.*** Each Holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim will receive the treatment set forth in Article 3 of the Plan.

**5.03     *Class 1: Priority Claims.*** On the later to occur of the Effective Date or entry of a Final Order Allowing the Claim, each Holder of an Allowed Priority Claim shall be paid by the Debtor from the Postconfirmation Distribution Fund, an amount, in Cash, equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code. Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid (a) on such other terms as may be agreed upon by the Holder of such Allowed Priority Claim and the Debtor or (b) as otherwise ordered by a Final Order of the Bankruptcy Court. Class 1 is Unimpaired by the Plan. Accordingly, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

**5.04     *Class 2: Postpetition Trade Claims.*** Class 2 consists of all Allowed Postpetition Trade Claims. On the Effective Date any Allowed Post Petition Trade Claims  in the normal course of business according the terms of any agreement or course of dealing between the Holder and the Debtor. Class 2 is Unimpaired by the Plan. Accordingly, Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

**5.05     *Class 3: Claims of Noteholders*.** Class 3 consists of all Allowed Claims of Noteholders in the amounts set forth in **Exhibit A-1** which shall control for the purposes of this Plan over any amount scheduled for such claimant by the Debtor or the amount of any proof of claim filed by a claimant.  Class 3 is Impaired by the Plan. Accordingly, Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.  Facteon Holdco will consist of the same number of membership interests as there is principal owed to Class 3 Claims, 19,027,689.  Pursuant to 11 U.S.C. § 1145, on the Confirmation

Date, each Class 3 claimant shall receive one membership interest in Facteon Holdco for each dollar of Debt owed to such claimant. The operation of Facteon Holdco shall be governed by the Operating Agreement attached hereto as **Exhibit B-2**. Facteon Holdco shall have three subsidiaries, the Debtor, a newly formed Facteon Asset Recovery, LLC and Comply First, LLC.

Any and all security agreements and security interests granted to Class 3 claimants by the Debtor pre petition and any Uniform Commercial Code Financing Statements shall be canceled and terminated by this Plan and each claimant shall be ordered by the confirmation order to release their security interest of record or the Debtor shall be authorized pursuant to 11 U.S.C. §1142 to cancel them.

Class 3 claimants shall receive a supplemental distribution on account of their Claim and Debt from the "Recovery from  BMMP" within thirty (30) days of the Debtor's receipt of the "Recovery from BMMP". Each claimant's distribution shall be equal to an amount computed by multiplying the "Recovery from BMMP" by a fraction, the denominator of which is 19,194,198 and the numerator of which is the amount of the claimant's Allowed Claim.

The Operating Agreements of  the Debtor and Comply First shall be amended and restated in the forms attached hereto as **Exhibits B-1 and B-4**. The Operating Agreement of Facteon Asset Recovery, LLC shall be in the form attached hereto as **Exhibit B-3**. All Operating Agreements shall be executed on or prior to the Effective Date of the Plan and pursuant to 11 U.S.C.§ 1142 and the Confirmation Order shall provide for a power of attorney enabling the Debtor to execute the Facteon Holdco Operating Agreement for all Class 3 Claimants.

**5.06** *Class 4: Unsecured Claims other than Noteholders.* Class 4 consists of all Allowed Unsecured Claims other than Noteholders in the amounts set forth in **Exhibit A-2**. Class 4 is Impaired by the Plan. Each Holder of an Allowed Class 8 Unsecured Claim is entitled to vote to accept or reject the Plan. Class 4 Claims shall receive a distribution in cash of twenty-two (22) percent of their Allowed Claim within sixty (60) days of the Effective Date.

Class 4 claimants shall receive a supplemental distribution from the "Recovery from BMMP" within thirty (30) days of the receipt of the final "Recovery from BMMP". Each claimant's distribution shall be equal to an amount computed by multiplying the "Recovery from BMMP" by a fraction, the denominator of which is 19,194,198 and the numerator of which is the amount of the claimant's Allowed Claim.

**5.07** *Class 5: Equity Interests.* Class 5 consists of all Equity Interests in the Debtor. Class 5  Holders are impaired. Each Holder of an Allowed Class 5 Interest is entitled to vote to accept or reject the Plan. The Equity Interests in the Debtor will be cancelled and

one hundred (100) new  membership interests will be issued to Facteon Holdco. The pre petition equity holders will have no interest in the reorganized debtor.

## Article 6
## ACCEPTANCE OR REJECTION OF PLAN

**6.01** *Each Impaired Class Entitled to Vote Separately.* The Holders of Claims in each Impaired Class of Claims will be entitled to vote separately to accept or reject the Plan unless there is an objection pending against such Claim at the time set for voting on the Plan and the Holder of such Claim has not sought an order of the Bankruptcy Court temporarily allowing such Claim for voting purposes.

**6.02** *Acceptance by Impaired Classes.* Classes 3, 4 and 5 are Impaired under the Plan. Holders of Claims in Classes 3 and 4 and Interests in Class 5 are entitled to vote to accept or reject the Plan. Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims will have accepted the Plan if (a) the Holders (other than any Holder designated pursuant  to  Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Equity Interests will have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

**6.03** *Presumed Acceptance of Plan.* Classes 1 and 2 are Unimpaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code,  the Holders of Claims in Unimpaired Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Except as otherwise expressly provided in the Plan, nothing contained in the Plan or otherwise will affect the Debtor's rights and legal and equitable claims or defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**6.04** *Deemed Non-Acceptance of Plan.* Holders of Classes 3 and 4 Claims are deemed to have rejected the Plan. Accordingly, votes of Holders of Classes 3 and 4 Claims are being solicited by the Debtor. Holders of Class 5 Equity Interests will not receive or retain any Property or equity interest under the Plan on account  of  such Equity Interests, and, therefore, votes of Holders of Class 5 Equity Interests are not being solicited by the Debtor.

**6.05    *Impairment Controversies.***    If a controversy arises as to whether any Claim  or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest, or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

**6.06    *Voting.***    If a Claim is the subject of an objection prior to the deadline for submission of votes and the Holder of the Claim has not filed a motion seeking relief under Rule 3018 of the Bankruptcy Rules, the Holder shall not be entitled to vote to accept or reject the Plan.

**6.07    *Cramdown.***    The Debtor hereby requests confirmation pursuant to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code with respect to Class 5 (which is deemed to have rejected the Plan) and with respect to any other impaired Class that votes to reject the Plan.

## Article 7
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.01    *Assumption/Rejection of Executory Contracts and Unexpired Leases.***
**Exhibit C** to the Plan identifies all Executory Contracts and Unexpired Leases to be Assumed Contracts under the Plan. The Debtor reserves the right to amend **Exhibit C** prior to the Confirmation Hearing with notice to the other party to such executory contract or unexpired lease. Any Executory Contract including, but not limited to, personal service or employment agreement, or Unexpired Lease that has not been expressly rejected or assumed by the Debtor with the Bankruptcy Court's approval on or prior to the Confirmation Date will be deemed rejected by the Debtor as of the Effective Date unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such Executory Contract or Unexpired Lease, or unless such Executory Contract or Unexpired Lease is listed in **Exhibit C** to the Plan. The Confirmation Order will constitute an order of the Bankruptcy Court, pursuant to Section 365 of the Bankruptcy Code, approving (a) the assumption of the Assumed Contracts, and (b) the rejection of Executory Contracts and Unexpired Leases which do not constitute Assumed Contracts.

**7.02    *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.***    Entry of the Confirmation Order shall, subject to and upon the occurrence  of  the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases assumed pursuant to§ 7.01 hereof, and (ii) the approval, pursuant

to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to §7.01 hereof. The assumption by the Debtor of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

**7.03    *Inclusiveness.*** Unless otherwise specified on **Exhibit C** each Executory Contract and Unexpired Lease listed or to be listed on **Exhibit C** shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on **Exhibit C**.

**7.04    *Cure of Defaults.*** Any lessor or other party to an Assumed Contract (except those lessors or other parties whose Unexpired Leases or Executory Contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any Unexpired Lease or Executory Contract under § 7.01 hereof, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from either objecting to assumption based upon an untimely Cure Claim, or from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtor. The Deb\tor shall have sixty (60) days from the Cure Claim Submission Deadline to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. All Allowed Cure Claims shall be paid within ten (10) Business Days after such Cure Claim is Allowed.

**7.05    *Claims under Rejected Executory  Contracts and Unexpired Leases.*** Unless otherwise ordered  by the Bankruptcy Court, any Claim  for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before thirty (30) days after the Confirmation Date or such Claim shall be forever barred and unenforceable against the Debtor or Facteon Holdco. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the foregoing deadline for filing a Claim in connection therewith. All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 4.

      **7.06**   *Insurance Policies.* All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto are treated as Executory Contracts and shall be assumed under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any Person or Entity, including the insurers under any of the Insurance Policies.

## Article 8
## MEANS OF IMPLEMENTATION AND EXECUTION OF PLAN

      **8.01**   The Plan and the distributions to Creditors provided for herein will be funded from the post confirmation operations of the Debtor.

      **8.02**   On the Confirmation Date, Noteholders shall receive their interests in Facteon Holdco.

      **8.03**   On the Confirmation Date, the Debtor's interest in Comply First shall be transferred to Facteon Holdco.

      **8.04**   On the Confirmation Date all of the Debtor's interest in claims and against third parties and assets with respect to the various customer related entities created by Thomas Nort and John Fred Nort in an effort to mitigate loses from the Debtor's customers shall be assigned and transferred to Facteon Asset Recovery, LLC except for the claim against Birnbrey Minsk Minsk & Perling, LLC and any claims that are not assignable under applicable law.

      **8.05**   On the Confirmation Date, one hundred (100) new membership interests in the Debtor shall be issued to Facteon Holdco.

## Article 9
## PROVISIONS GOVERNING DISTRIBUTIONS

      **9.01**   Determination of Claims.

      (a)    From and after the Effective Date, the Debtor shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims.  Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Debtor), and the Confirmation Order shall contain appropriate language to that effect. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after the Debtor receives actual notice of the filing of such Claim.

(b)      Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the objecting party effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

(c)      Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Reorganization Case, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. Prior to the Effective Date, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(G) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

**9.02   *Distribution Dates.*** Distributions to Holders of Allowed Claims shall be made as set forth in Article 5 above.

**9.03   *Interest on Claims.*** Except as provided in a Final Order entered in the Bankruptcy Case, (a) no holder of any Claim shall be entitled to interest accruing on or

after the Petition Date on such Claim, and (b) interest shall not accrue or be paid upon any Disputed Claim with respect to the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim, or any part thereof, becomes an Allowed Claim.

**9.04   *One Distribution Per Holder.*** If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

**9.05   *Effect of Preconfirmation Distributions.*** Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtor to such Holder under the Plan.

**9.06   *Payments by Cash; Small Distribution; Rounding.*** All payments made pursuant to this Plan shall be in Cash and by any means reasonably selected by the Debtor, as applicable, including check or wire transfer. If a Cash payment to be received by any Holder of an Allowed Claim on any Distribution Date (except the final Distribution) would be $100 or less in the aggregate, notwithstanding any contrary provision of this Plan, no such payment will be made to such Holder, and such Cash, if applicable, shall be held for such Holder until the next Distribution Date, at which time such Cash payment shall be made to the Holder (unless this Section 9.06 shall again apply). Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.

**9.07   *Disputed Claims.*** Notwithstanding any other provisions of this Plan, no payments or other Distribution of any kind will be made on account of any Claim until such Claim becomes an Allowed Claim and then only to the extent that such Claim is an Allowed Claim. The Debtor shall establish and maintain a reserve sufficient to fund Disputed Claims that may subsequently become Allowed Claims, as determined by the Debtor's prudent judgment and approved by the Committee. To the extent a Disputed Claim becomes an Allowed Claim after any initial Distributions, a Distribution as calculated above shall be made in respect of such Allowed Claim within 30 days after such claim becomes an Allowed Claim. Notwithstanding the foregoing, any holder of both an Allowed Claim(s) and a Disputed Claim(s) shall receive the appropriate payment or Distribution on the Allowed Claim(s), except no payment or distribution shall be made on the Disputed Claim(s) until such dispute is resolved by settlement or Final Order.

**9.08   *Unclaimed Property.*** Unclaimed Property shall be held in an "Unpaid

Claims Reserve" to be held for the benefit of the holders of Allowed Claims entitled thereto under the terms of the Plan. For a period of the later of one year following the first Distribution to a Class of Claims or 180 days after a Distribution is made to a claimant on account of which Unclaimed Property first results (said period being hereinafter referred to as the "Claiming Period"), Unclaimed Property shall be held in the Unpaid Claims Reserve solely for the benefit of the holders of Allowed Clams which have failed to claim such property. During the Claiming Period, Unclaimed Property due the holder of an Allowed Claim shall be released from the Unpaid Claims Reserve and delivered to such holder upon presentation of proper proof by such holder of its entitlement thereto. In the event there is Unclaimed Property in the Unpaid Claims Reserve with regard to any Claim, the Debtor shall, until such Unclaimed Property is claimed or the Claiming Period with regard to the Holder of such Claim has expired, make all subsequent Distributions due with regard to such Claim to the Unpaid Claims Reserve. After the Claiming Period with regard to such holder has expired, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being disallowed, waived, and satisfied; provided, however, that the Claiming Period may be extended for the Holder of any Allowed Claim by agreement of the Debtor. At the end of the Claiming Period, the Holder of an Allowed Claim theretofore entitled to Unclaimed Property shall cease to be entitled thereto. Notwithstanding the foregoing, if there is any Unclaimed Property in the Unpaid Claims Reserve and Unclaimed Property remains in the Unpaid Claims Reserve after expiration of the Claiming Period and if, in the sole judgment of the Debtor, the Unclaimed Property is not sufficient to make a meaningful Distribution, it shall be retained by the Debtor. These provisions shall apply without regard to any applicable non-bankruptcy laws with respect to unclaimed property. The Unpaid Claims Reserve may be maintained as an interest bearing account.

**9.09** *Compliance with Tax Requirements.* In connection with the Plan, the Debtor shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

## Article 10
## CONDITIONS PRECEDENT

**10.01** *Condition Precedent to Confirmation of the Plan.* Entry of the Confirmation Order, effectiveness of Confirmation of the Plan, and the obligation of the Debtor to consummate this Plan are conditioned upon the Bankruptcy Court having made findings and determinations regarding the Plan as will enable the entry of the

Confirmation Order in a manner consistent with the provisions of the Plan and in form and substance satisfactory to the Debtor and the Creditors Committee.

**10.02** ***Condition Precedent to Effective Date.***  The Effective Date will not occur and the Plan will not be consummated until: (a) the Bankruptcy Court has entered the Confirmation Order on the Docket of the Reorganization Case which Confirmation Order is satisfactory in form and substance to the Debtor, and the Creditors Committee; (b) all actions, documents, and agreements necessary to implement the Plan will have been effected or executed and delivered, as required under the Plan, including, but not limited to the Debtor's Operating Agreement , and any other Plan Documents; and (c) the Confirmation Order has become a Final Order.

**10.03** ***Waiver of Conditions Precedent.***  The Debtor, with the consent of the Creditors Committee may elect to waive any condition precedent set forth above that has not been satisfied on or before  the expiration of fourteen (14) days following entry of the Confirmation Order.

## Article 11
## DISCHARGE, RELEASE, LIMITATION
## OF LIABILITY, AND GENERAL INJUNCTION

**11.01** ***Discharge of Claims.***  Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order will operate as a discharge, pursuant to  Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of any and all Debts of, and Claims of any nature whatsoever against the Debtor that arose at any time prior to the Confirmation Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date.  Without limiting  the generality of the foregoing, except as expressly set forth in this Plan, on the Effective Date, the Debtor, the Estate, and their respective successors or assigns, will be discharged from any Claim or Debt that arose prior to the Confirmation Date and from any and all Debts of the kind specified  in Section  502(g), 502(h), or 502(i) of the Bankruptcy  Code, regardless  of whether (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan.  As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of a Claim, will be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtor, the Estate, Facteon Holdco or any of their respective successors and assigns, or the assets or Property of any of them, any other or further Claims, Debts, rights, causes of action, remedies, Liabilities, or anything based upon any act, omission, document, instrument, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in

connection with implementation of the Plan, and the Confirmation Order will contain appropriate injunctive language to that effect.  In accordance with the foregoing, except as specifically provided in the Plan or in the Confirmation Order, the Confirmation Order will be a judicial determination of the discharge of all such Claims and other  Debts and Liabilities against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge  will void any judgment obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged Claim, Liability or Debt. Holders of Administrative Expense Claims  (including Holders  of  any Claims for Postpetition Federal, state, or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Administrative Expense Claims Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtor, the Estate,  or any of their respective property.

**11.02** *General Injunction.*  Pursuant to sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce  any rights  or obligations under the Plan or the Plan Documents:  (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Estate, or their  respective property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Estate, or their respective property; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor, the Estate, or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; or (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor, or the Estate under the Plan and the Plan Documents and the other documents executed in connection therewith. The Debtor shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this§ 11.02 shall not release, or be deemed a release of, any of the Causes of Action.

**11.03** *Exculpation from Liability.*   The Debtor, and its current officers, the Professionals for the Debtor (acting in such capacity), the Creditors Committee, and its members, and the Professionals for the Creditors Committee (acting in such capacity), Facteon Holdco, Facteon Asset Recovery and their respective officers, directors and

employees (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Reorganization Case, in each case (or the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision **shall not be applicable to** any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party or of any prepetition acts of any sort of the officers, directors, members or managers and professionals of the Debtor including, but not limited to, Birnbrey, Minsk, Minsk & Perling, LLC. The rights granted under this§ 11.03 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision o[the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this § 11.03 shall not release, or be deemed a release of. any of the Causes of Action or any action against John Fred Nort, Thomas Nort or any entity in which they directly or indirectly hold any interest and any constituent thereof, or of Birnbrey, Minsk, Minsk & Perling, LLC and any of its members, employees or professionals. Further, for the avoidance of doubt, nothing in this Plan or the order confirming it shall serve to release, novate or other impair the personal liability of Thomas Nort, or John Fred Nort pursuant to their guaranty of repayment of any Class 3 claim.

**11.04 *Release.*** On the Effective Date, the Exculpated Parties shall be unconditionally and are hereby deemed to be unconditionally released from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtor, the Reorganization Case, any Property of the Debtor, the business or operations of the Debtor, any Plan Documents, the Plan, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party nor shall this release apply to any prepetition acts of any of the professionals, officers, directors, members or managers of any of the Debtor. The Confirmation Order shall enjoin the

prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision. This release provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein and for the sake of clarity, the provisions of this § 11.04 shall not release, or be deemed a release of any of the Causes of Action, any action against John Fred Nort, Thomas Nort or any entity in which they directly or indirectly hold any interest or any constituent thereof, or any prepetition acts of any of the professionals, officers, directors, members or managers of the Debtor including, but not limited to, Birnbrey, Minsk, Minsk & Perling, LLC and any of its members, employees or professionals. Further, for the avoidance of doubt, nothing in this Plan or the order confirming it shall serve to release, novate or other impair the personal liability of Thomas Nort John or Fred Nort pursuant to their guaranty of repayment of any Class 3 claim.

**11.05 *Barton Doctrine.*** The "Barton Doctrine'', e.g. *Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672 (1881) (Supreme Court held that a trustee cannot be sued without leave of the bankruptcy court), which prohibits a party from suing either a trustee, the officers of a debtor in possession, or their attorneys, in a non-appointing court for acts done in their official capacity, shall pertain to the provisions of this Article 11, and shall stand as one of the bases for enforcement of the provisions herein. See, e.g., *Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000)("[j]oining the other circuits that have considered this issue, we hold that a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity"); *Patco Energy Express v. Lambros*, 2009 U.S. App. LEXIS 25771 (11th Cir. 2009) ("[w]here a plaintiff neglects to obtain leave from the appointing court, a suit filed [against a bankruptcy trustee] in another court must be dismissed for lack of subject matter jurisdiction"); *In the Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240-41 (6th Cir. 1993) ("[i]t is well settled that leave of the appointing forum must be obtained by any party wishing to institute an action in a nonappointing forum against a trustee, for acts done in the trustee's official capacity and within the trustee's authority as an officer of the court .... counsel for trustee, court appointed officers who represent the estate, are the functional equivalent of a trustee"); *In re Balboa Improvements, Ltd.*, 99 B.R. 966, 970 (9th Cir. BAP 1989) (holding that permission to sue debtor's attorney for alleged misconduct in the administration of an estate must be obtained from the bankruptcy court.

**11.06 *Continuation of Automatic Stay.*** The automatic stay arising out of Section 362(a) of the Bankruptcy Code shall continue in full force and effect until the

Consummation Date, and the Debtor, and the Estate shall be entitled to all of the protections afforded thereby. The Court shall have the power to grant such additional and supplemental stays as may be necessary or appropriate to protect and preserve the assets of the Debtor, and the Estate

**11.07** *No Liability for Tax Claims.* Unless a taxing Governmental Authority has asserted a Claim against the Debtor before the Bar Date or Administrative Expense Claim Bar Date established therefore, no Claim of such Governmental Authority shall be Allowed against the Debtor or its directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.   The entry of the Confirmation Order shall be deemed to be a determination that no provision of the Plan has avoidance of taxes as a principal purpose, and the Confirmation Order shall so provide.

**11.08** *Regulatory or Enforcement Actions.*  Nothing in this Plan shall restrict any federal government regulatory agency from pursuing any regulatory or police enforcement action or performing its statutory duties against any Person or Entity in any forum, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the Bankruptcy Code.   Nothing contained in this § 11.08 is intended to, nor shall it, supersede or alter any applicable provisions of the Bankruptcy Code.

**11.09** *No Liability for Untimely Administrative Expense Claims.*  Holders of Administrative Expense Claims (including Holders of any Claims for Postpetition Federal, state or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Administrative Expense Claims Bar· Date will be forever barred from asserting such Administrative Expense Claims against the Debtor, or the Estate, or any of their respective properties.

## Article 12
## RETENTION  OF JURISDICTION

**12.01** *General Retention.*  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Reorganization Case is closed, the Bankruptcy Court will retain the fullest and most extensive jurisdiction of the Reorganization Case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried.

**12.02** *Specific Purposes.*  In addition to the general retention of jurisdiction  set

forth in §12.01, after Confirmation of the Plan and until the Reorganization Case is closed, the Bankruptcy Court will retain jurisdiction of the Reorganization Case for the following specific purposes:

(a)    to allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application for an Administrative Expense, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

(b)    to determine any and all Case, controversies, suits  or  disputes arising under or relating to the Plan or the Confirmation Order (including regarding the effect of any release, discharge, or injunction provisions provided for herein  or affected hereby and regarding whether conditions to the consummation and/or Effective Date of the Plan have been satisfied) and to enforce the obligations under the Plan;

(c)    to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Reorganization Case; provided, however, that this retention of jurisdiction  will not require prior Bankruptcy  Court approval of the payment of fees and reimbursement of expenses of Professionals after Confirmation of the Plan unless an objection to such fees and expenses has been made by the Debtor or the Debtor;

(d)    to determine any and all motions pending as of the date  of  the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption or assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable (including Assumed Contracts), and to determine the allowance of any Claims resulting from the rejection thereof or any amount necessary to cure defaults in any assumed and/or assigned executory contracts or unexpired leases (including Assumed Contracts), including Cure Claims;

(e)    to determine any and all motions, applications, adversary proceedings, contested or litigated matters, causes of action, and any other  matters involving  the Debtor commenced in connection with, or arising  during, the Reorganization  Case;

(f)    to enforce, interpret, and administer the terms and provisions of the Plan and the Plan Documents;

(g)    to hear and determine all proceedings necessary to enforce the

remedies reserved for in the Plan and the Plan Documents including;

(h)    to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules subject to the provisions of the Plan;

(i)    to consider and act the compromise and settlement of any  Claim against or Equity Interest in the Debtor or the Estate;

(j)    to assure the performance by Debtor of its obligations to make distributions under the Plan or satisfy any other obligations arising or assumed under the Plan;

(k)    subject to the consent of the Creditors Committee, to correct any defect, cure any omission, reconcile any inconsistency, and make any other necessary change or modification in or to the Disclosure Statement, the Plan, the Plan Documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein  so that the intended effect of the Plan may be substantially realized thereby;

(l)    to resolve any disputes concerning any release  of a nondebtor under the Plan or the injunction against acts, employment of process, or actions against such nondebtor arising under the Plan;

(m)    to enforce all orders, judgments, injunctions, and rulings entered in connection with the Reorganization Case;

(n)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Plan Documents;

(o)    to review and approve any sale or transfer of assets or Property by the Debtor, including prior to or after the date of the Plan, and determine all questions and disputes regarding such sales or transfers;

(p)    to determine all questions and disputes regarding title to the assets of the Debtor, or the Estate;

(q)    to determine any motions or contested  matters relating to the Causes

of Action, whether brought before or after the Effective Date;

(r)    to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtor arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plan;

(s)    to resolve any determinations which may be requested by the Debtor of any unpaid or potential tax liability or any matters relating to unpaid or potential tax liability under Sections 505 and 1146(d) of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion of taxable year ending on or before the Effective Date;

(t)    to issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(u)    to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(v)    to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Documents;

(w)    to enter such orders as are necessary to implement and enforce the injunctions described in this Plan;

(x)    to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(y)    to enter an order concluding and terminating the Reorganization Case.

**12.03** *Reopening of the Reorganization Case.* In addition to the retention of jurisdiction set forth in §§12.01 and 12.02 above, the Bankruptcy Court will retain jurisdiction of the Reorganization Case to enter an order reopening the Reorganization Case after they have been closed.

## Article 13
## MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTION

**13.01** *Modification Prior to Entry of Confirmation Order.*  The Debtor may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and subject in all respects to approval of the Creditors Committee.

**13.02** *Modification After Entry of Confirmation Order.* After the entry of the Confirmation Order, the Debtor may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtor or may  obtain approval of the Bankruptcy Court for such modification, after notice and a hearing, (b) the Debtor has consented to such modification, (c) the Creditors Committee has consented to such modification, and (d) such modification will not materially adversely affect the interests, rights, treatment, or distributions of any Class of Allowed Claims under the Plan.

## Article 14
## MISCELLANEOUS PROVISIONS

**14.01** *No Admissions.*  The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtor. Nothing herein will be construed to be an admission of any fact or otherwise binding upon the Debtor in any manner prior to the Effective Date.

**14.02** *Revocation or Withdrawal of the Plan.*  The Committee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Committee revokes or withdraws the Plan, or if Confirmation of the Plan does not occur, then the Plan will be deemed null and void in all respects, and nothing contained in the Plan will be deemed (a) to constitute a waiver or release of any Claims by or against, or Equity Interests in, the Debtor or any other Person, (b) to constitute a waiver or release of any Claims by the Creditors Committee, or (c) to prejudice in any manner the rights of the Debtor or any other Person, including the Creditors Committee, in any further proceedings involving the Debtor.

**14.03** *Settlement of Claims and Causes of Action.*  Except as otherwise provided in the Plan, the Debtor  may commence or continue in any appropriate court or tribunal any  suit or other proceeding for the enforcement of any claim or Cause of Action which the Debtor in Possession had or had power to assert immediately prior to the Effective Date and may settle or adjust such claim or Cause of Action in accordance with the terms of the Plan.

**14.04** *Standard for Approval by Bankruptcy Court.*   If any of the matters described in this Plan is brought for approval before the Bankruptcy Court, any such approval will mean the entry of an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 debtor in possession.

**14.05** *Further Assurances.*   The Debtor and the Committee agree and/or are authorized to execute and deliver any and all papers, documents, contracts, agreements, and instruments that ·may be necessary to carry out and implement the terms and conditions of the Plan.

**14.06** *Headings.*   The headings and table of contents used in the Plan are for convenience and reference only and will not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

**14.07** *Notices.* All notices, requests, or other documents in connection with or required to be served by the Plan will be in writing-and will be sent by first class United States mail, postage prepaid, or by overnight delivery by a recognized courier service, to:

If to the Debtor:

> FACTEON, LLC
> 700 Galleria Parkway
> Suite 435
> Atlanta, Georgia 30330
> Attn: Eric Benson

with a mandatory copy to:

> M. Denise Dotson
> M. DENISE DOTSON, LLC
> 170 Mitchell Street
> Atlanta, Georgia 30303

And with a mandatory copy to:

> JOHN A. CHRISTY
> SCHREEDER, WHEELER & FLINT, LLP
> 1100 Peachtree Street, N.E.
> Suite 800
> Atlanta, Georgia 30309-4516

**14.08** *Contemporaneous Service.*   Copies of all notices under this Plan to any

party will be given to the Debtor, the Debtor, and the Creditors Committee contemporaneously with the giving of notice to such party.

**14.09  *Changes of Address.***   Any entity may change the person or address to whom or to which notices are to be given hereunder by filing a written instrument to that effect with the Bankruptcy Court and serving same on the parties set forth above.

**14.10  *Designated Notice Sufficient.***   Notwithstanding any other provision of this Plan, when notice and a hearing are required with regard to any action to be taken by the Debtor, Designated Notice shall be adequate. With respect to any proposed action to be taken as authorized under this Plan which may only be taken following Designated Notice, the following procedures shall apply. After Designated Notice of the proposed action has been provided as required under the Plan, if any party in interest files with the Court within ten (10) days of the service of such Designated Notice a written objection to the proposed action, and serves a copy of said objection upon the Debtor and the Creditors Committee, and their respective  counsel, then the Court shall schedule a hearing with respect to such objection and, unless the objection is withdrawn by agreement of the parties, the proposed action may only be taken if approved by Final Order of the Court. If no objection is timely filed and served, the proposed action may be taken without further authorization or approval by the Court.

**14.11  *Governing Law.***   Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or to the extent that the Plan or the provision of any contract, instrument, release, indenture, or other agreement or document  entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan will be governed by, construed, and enforced in accordance with the laws of the State of Georgia, without giving effect to the principles of conflicts of law thereof.

**14.12  *Limitation of Allowance.***   No attorney's fees, punitive damages, penalties, special damages, lost profits, treble damages, exemplary damages, or interest will be paid with respect to any Claim or Equity Interest except as specified herein or as Allowed by a Final Order of the Bankruptcy Court.

**14.13  *Estimated Claims.***   To the extent that any Claim is estimated for any purpose other than for voting,  then in no event will such· Claim be Allowed in an amount greater than the estimated amount.

**14.14  *Consent to Jurisdiction.***   Upon any default under the Plan, the Debtor, the Debtor consents to the jurisdiction  of the Bankruptcy Court or any successor to the Bankruptcy Court and agree that it will be the preferred forum for all  proceedings relating to any such default.  Except as otherwise provided in the Plan, or the Plan Documents, by accepting any distribution or payment under or in connection with the

Plan, by filing any Proof of Claim, by filing any Cure Claim, by voting on the Plan, or by entering an appearance in the Reorganization Case, all Creditors and other parties in interest, including foreign Creditors and foreign parties in interest, have consented, and will be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Plan or the Reorganization Case, including the matters and purposes set forth in Article 12 of the Plan.  The Bankruptcy Court will maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in Article 12 of the Plan.

**14.15  *Setoffs.***  Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Debtor may, but will not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtor of any such claim that the Debtor may have against such Holder.

**14.16  *Successors and Assigns.***  The rights, benefits, duties, and obligations of any Person named or referred to in the Plan will be binding upon and will inure to the benefit of any heir, executor, administrator, successor, or assign of such Person.

**14.17  *No Interest.***  Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no  Holder of an Allowed Claim will be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Claim for any purpose.

**14.18  *Modification of Payment Terms.***  The Debtor reserve the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date, upon the consent of the Holder of such Allowed Claim.

**14.19  *Entire Agreement.***  The Plan and Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Person will be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

**14.20  *Severability of Plan Provisions.***  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, subject to the consent of the Creditors Committee, will have the power to alter and interpret such term or

provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**14.21** ***Confirmation Order and Plan Control.*** To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtor and any third party, unless otherwise expressly provided in the Plan, the Plan controls the Disclosure Statement and any such agreements, and the Confirmation Order (any and other orders of the Court) will be construed together and consistent with the terms of the Plan.

**14.22** ***Computation of Time.*** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

FACTEON, LLC

By:\s\ Eric Benson
Eric Benson
Its: Interim CEO

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
FACTEON, LLC

By : \s\ Joseph C. Kolshak
*Joseph C. Kolshak, Chairman*

M. DENISE DOTSON, LLC

 /s/M. Denise Dotson
M. Denise Dotson
Georgia Bar No. 227230
Attorney for Facteon, LLC

170 Mitchell Street
Atlanta, GA 30303
Telephone: (404) 526-8869
Facsimile: (404) 526-8855
ddotsonlaw@me.com


\s\ *John A. Christy*
JOHN A. CHRISTY
Georgia Bar No. 125518
Attorney for the Official Committee of
Unsecured Creditors of Facteon, LLC


SCHREEDER, WHEELER & FLINT, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
Telephone:    (404) 681-3450
Facsimile:    (404) 681-1046
E-mail:       *jchristy@swfllp.com*


K:\9178\1\PLAN DOX-FINAL\Joint Plan of Reorganization  9-13.docx

# EXHIBIT A-1

## LIST OF NOTEHOLDERS AND AMOUNTS

| | | |
|---|---|---|
| Thomas Norwood | Thomas W. Norwood<br>1190 Crest Valley Dr<br>Atlanta GA 30327 | $ 2,320,000.00 |
| Roger C Tutterow | Roger C Tutterow<br>502 Vinings Crest<br>Smyrna GA 30080 | $ 2,052,791.52 |
| Merrill Lynch | Merrill Lynch<br>Attn: Vicki Lloyd<br>150 N. College St. Suite 2800<br>Charlotte NC 28255 | $ 761,841.52 |
| Barclay & Lorita Resler | Barclay & Lorita Resler<br>7721 Crossover Drive<br>Mc Lean VA 22102 | $ 700,000.00 |
| Lawson K Broadrick | Lawson K Broadrick<br>300 Landfall Rd. NW<br>Atlanta GA 30328 | $ 627,684.89 |
| Alison M Drummond | Alison M Drummond<br>3452 Greystone Ct<br>Marietta GA 30068 | $ 609,900.00 |
| Edw. C Mitchell IRA acct. 929992560 | TD AMERITRADE, Inc.<br>4075 Sorrento Valley Blvd.<br>San Diego CA 92121 | $ 550,000.00 |
| Polestar Capital, LLC | Polestar Capital, LLC<br>David Homrich - AMB Foundation<br>3223 Howell Mill Rd, NW<br>Atlanta GA 30327 | $ 500,000.00 |
| John Whitmore | John Whitmore<br>209 S. STEPHANIE ST. STE B-169<br>Henderson NV 89012 | $ 480,000.00 |
| Daniel J. Homrich | Mr. Daniel J. Homrich<br>1947 Carrington Ct.<br>Stone Mountain GA 30087-1447 | $ 410,000.00 |
| Gary L Beck (Lincoln Trust) | Lincoln Trust<br>P.O. Box 5831<br>Denver CO 80217 | $ 390,000.00 |
| Michael Brumit | Michael Brumit<br>1090 Waterbury Close<br>Powder Springs GA 30127 | $ 366,000.00 |
| Steve Kramer (IRA) | TD Ameritrade<br>4075 Sorrento Valley Blvd<br>San Diego CA 92121 | $ 352,000.00 |

| | | | |
|---|---|---|---|
| Diane M Ashkouti | Diane M Ashkouti<br>50 Old Stratton Chase<br>Atlanta GA 30328 | $ | 350,000.00 |
| Lester Sheppard | Lester Sheppard<br>1081 Flemings Knoll<br>Greensboro GA 30642 | $ | 350,000.00 |
| Samuel Calvin Rogers | Samuel Calvin Rogers<br>4396 Paces Point Circle<br>Smyrna GA 30080 | $ | 335,000.00 |
| Annette Reed | Annette Reed<br>3921 Glenhurst Dr, SE<br>Smyrna GA 30080-5897 | $ | 300,000.00 |
| Linda Norwood | Linda Norwood<br>1190 Crest Valley Dr<br>Atlanta GA 30327 | $ | 286,256.22 |
| Fred C Follmer | Fred C Follmer<br>800 Jett Ferry Manor<br>Atlanta GA 30350 | $ | 280,000.00 |
| Tabas II LLP | Tabas II LLP<br>Century Springs West<br>6000 Lake Forrest Dr., Ste 400<br>Atlanta GA 30328 | $ | 275,000.00 |
| Gary Pheasant | Gary Pheasant<br>1099 Lanier Blvd<br>Atlanta GA 30306 | $ | 264,987.15 |
| Marsha M. Crowder | Marsha M. Crowder<br>325 McDaniel Rd<br>Marietta GA 30064 | $ | 250,000.00 |
| Albert M. Pearson | Albert M. Pearson<br>3849 West Nancy Creek Place<br>Atlanta GA 30319 | $ | 250,000.00 |
| Bonita Tew | Bonita Tew<br>16314 E Dakota Rd<br>Claremore OK 74017 | $ | 245,000.00 |
| Glenda F McCormick-Lewis | Glenda F McCormick-Lewis<br>1 Old Paces Place<br>Atlanta GA 30327 | $ | 230,000.00 |
| Royal Waffle King Corp | Royal Waffle King Corp<br>1459 Field Park Circle<br>Marietta GA 30066 | $ | 226,144.62 |
| Michael J Goldman | Michael J Goldman<br>1094 Lanier Blvd<br>Atlanta GA 30306 | $ | 213,295.53 |
| Edward P. Clancy | Edward & Sara Clancy<br>749 Camp Woods Rd<br>Villanova PA 19085-1004 | $ | 205,424.66 |

| | | | |
|---|---|---|---|
| Rachel Hammer | Rachel Hammer<br>3508 Meeting House Mtn. Rd.<br>Clayton GA 30525 | $ | 200,000.00 |
| Jeanette Ramming | Jeanette Ramming<br>1 Lewis St.<br>Hillsborough NJ 08844 | $ | 200,000.00 |
| Kendall Summerhawk | NTC & Co<br>fbo Kendall Summerhawk<br>P.O. Box 173859<br>Denver CO 80217-5831 | $ | 186,000.00 |
| Robert Norwood | Robert Norwood<br>834 Kipling Dr.<br>Atlanta GA 30318 | $ | 170,000.00 |
| Charlie N Crowder | Charlie N Crowder<br>1459 Field Park Cir<br>Marietta GA 30066 | $ | 150,000.00 |
| Joseph Kolshak | Joseph Kolshak<br>19591 Vintage Trace Cir<br>Fort Myers FL 33967 | $ | 150,000.00 |
| Catherine Nort | Catherine Nort<br>2178 LeBaron Dr.<br>Atlanta GA 30345 | $ | 134,300.00 |
| Rebecca Fredericks | Rebecca Fredericks<br>P.O. Box 1325<br>Alpharetta GA 30009-1325 | $ | 132,500.00 |
| Mary Grace Miller | Mary Grace Miller<br>3872 Chaucer Wood<br>Atlanta GA 30319-1672 | $ | 130,000.00 |
| Mike Jennings | Mike Jennings<br>9810 Ottobahn<br>Amarillo TX 79119 | $ | 120,000.00 |
| Top Rows LLC | Top Rows LLC<br>2870 Peachtree Rd<br>Box 998<br>Atlanta GA 30305 | $ | 120,000.00 |
| Mrs. John Tutterow | Mrs. John Tutterow<br>177 N. Highland #1114<br>Memphis TN 38111 | $ | 112,000.00 |
| Estate of Kenneth F. Magina | Bonita Tew<br>16314 E Dakota Rd<br>Claremore OK 74017 | $ | 110,000.00 |
| Corners Court, LLC | Century Springs West<br>6000 Lake Forrest Dr., Ste 400<br>Atlanta GA 30328 | $ | 100,000.00 |

| | | | |
|---|---|---|---|
| Shops @ South Cobb, LLC | Shops @ South Cobb, LLC<br>Century Springs West<br>6000 Lake Forrest Dr, Ste 400<br>Atlanta GA 30328 | $ | 100,000.00 |
| Gary L Beck | Gary L Beck<br>2033 2nd Ave, Apt 1910<br>Seattle WA 98121 | $ | 100,000.00 |
| James K Cheney | James K Cheney<br>200 River Bottom Rd<br>Athens GA 30606 | $ | 100,000.00 |
| C Paul Jolly | C Paul Jolly<br>4431 Davidson Ave<br>Atlanta GA 30319 | $ | 100,000.00 |
| Keagan R. Lenihan | Keagan R. Lenihan<br>3627 Trinity Drive<br>Alexandria VA 22304 | $ | 100,000.00 |
| Peter MacGregor | Peter MacGregor<br>904 Steam Valley Trl.<br>Alpharetta GA 30022 | $ | 100,000.00 |
| Donald W. Paul | Donald W. Paul<br>3770 Harbour Landing Drive<br>Gainesville GA 30506 | $ | 100,000.00 |
| James E Vann | James E Vann<br>1354 Murrays Loch Place<br>Kennesaw GA 30152 | $ | 100,000.00 |
| Pierce Resler Coffee | Pierce Resler Coffee<br>805 Cresent Dr<br>Alexandria VA 22302 | $ | 97,500.00 |
| Janet Ashkouti | Century Springs West<br>6000 Lake Forrest Dr., Ste 400<br>Atlanta GA 30328 | $ | 80,000.00 |
| Herbert or Rose Marie Paul | Herbert or Rose Marie Paul<br>6821 Huntingridge Rd<br>Chapel Hill NC 27517 | $ | 75,000.00 |
| Sutton Resler | Sutton Resler<br>7721 Crossover Drive<br>Mc Lean VA 22102 | $ | 75,000.00 |
| Mark Homrich | Charles Schwab & Co., Inc.<br>Orlando Operations Center<br>P.O. Box 628291<br>Orlando FL 32862-8291 | $ | 70,000.00 |
| Sandra Gould | Sandra Gould<br>88 Poor Farm Rd<br>Lyman ME 04002 | $ | 60,827.38 |
| Mary E Carlson | Mary E Carlson<br>335 Hammond Dr., Unit 618<br>Atlanta GA 30328 | $ | 60,000.00 |

| | | | |
|---|---|---|---|
| Marilyn Pheasant | Marilyn Pheasant<br>21 Madison Ave.<br>Rochester NH 03867 | $ | 57,247.48 |
| Jack F. Crowder (IRA) | TD Ameritrade<br>4075 Sorrento Valley Blv<br>San Diego CA 92121 | $ | 55,000.00 |
| Dawn Connell | Dawn Connell<br>10108 Buggy Horse Rd<br>Charlotte NC 28277 | $ | 52,500.00 |
| Ellis A Mansour | Ellis A Mansour<br>7 Mission Dr<br>Newnan GA 30263 | $ | 50,000.00 |
| Linda Haley Blumberg | c/o Drew Blumberg<br>ADB Services Inc<br>8215 Roswell Rd., Bldg 1100<br>Atlanta GA 30350 | $ | 50,000.00 |
| Rob Caldwell | Robert Caldwell<br>4628 Robie Rd<br>Lilburn GA 30047 | $ | 50,000.00 |
| Patric Jordan | Patric Jordan<br>445 Cameron Valley Ct<br>Atlanta GA 30328 | $ | 50,000.00 |
| Richard Martin | Richard Martin<br>2460 Brookhaven Heights Ct<br>Atlanta GA 30319 | $ | 50,000.00 |
| Land Associates, Inc. | Land Associates, Inc.<br>200 River Bottom Rd.<br>Athens GA 30606 | $ | 50,000.00 |
| RJK Ventures LLLP | RJK Ventures LLLP<br>2130 Clay Dr.<br>Atlanta GA 30350 | $ | 50,000.00 |
| Diane A Domit | Diane A Domit<br>5301 Ashley Trace<br>Atlanta GA 30360 | $ | 46,666.67 |
| Charlene Shikany | Charlene Shikany<br>1715 N. Holly Ln<br>Atlanta GA 30329-3523 | $ | 45,500.00 |
| Michelle Mansour | Michelle Mansour<br>9 Mission Dr<br>Newnan GA 30263 | $ | 45,000.00 |
| Lisa Barranco Murphy | Lisa Barranco Murphy<br>Mountain Lake<br>P.O. Box 832<br>Lake Wales FL 33859 | $ | 45,000.00 |
| Paula Elliott | Dr. Paula Elliott<br>9460 Magnolia Crossing Dr.<br>Greenwell Springs LA 70739 | $ | 40,000.00 |

| | | | |
|---|---|---|---|
| Anna Kramer | Anna Kramer<br>2825 Northbrook Dr<br>Atlanta GA 30340 | $ | 35,000.00 |
| Michael Kramer | Michael Kramer<br>3646 Emerald St.<br>APT 131<br>Torrance CA 90503 | $ | 35,000.00 |
| Diane & Mitchell Domit | Diane & Mitchell Domit<br>5301 Ashley Trace<br>Atlanta GA 30360 | $ | 30,000.00 |
| Patric Jordan - IRA | TD Ameritrade<br>4075 Sorrento Valley Blvd<br>San Diego CA 92121 | $ | 30,000.00 |
| Charlie Shikany | Charlie Shikany<br>1400 F Church St<br>Decatur GA 30030 | $ | 29,351.97 |
| LaRue S Sellars | Larue S Sellars<br>2308 Huntingdon Chase<br>Dunwoody GA 30350 | $ | 28,000.00 |
| Sara P. Reed | Sara P. Reed<br>1285 Lanier Pl., NE<br>Atlanta GA 30306 | $ | 27,054.13 |
| Merrell F Adams (IRA Acct) | TD Ameritrade<br>4075 Sorrento Valley Blvd<br>San Diego CA 92121 | $ | 25,000.00 |
| Keith Caldwell | Keith Caldwell<br>1723 Sweet Branch Trl<br>Grayson GA 30017 | $ | 25,000.00 |
| Robert E Flanagan Sr | Robert E Flanagan Sr<br>15 Mansour Dr<br>Newnan GA 30263 | $ | 25,000.00 |
| Dean Fowler | Dean Fowler<br>8385 Sentinae Chase Dr<br>Roswell GA 30076 | $ | 25,000.00 |
| A Trent Germano | A Trent Germano<br>PO Box 420648<br>Atlanta GA 30342-0648 | $ | 25,000.00 |
| Robert Huttman | Robert Huttman<br>1252 Hampton Hall Dr<br>Atlanta GA 30319 | $ | 25,000.00 |
| Kathleen McFadden (IRA Acct) | TD Ameritrade<br>4075 Sorrento Valley Blvd<br>San Diego CA 92121 | $ | 25,000.00 |
| Ned T Murphy | Ned T Murphy<br>Mountain Lake<br>P.O. Box 832<br>Lake Wales FL 33859 | $ | 25,000.00 |

| | | | |
|---|---|---|---|
| Michael or Ramona Sauter | Michael or Ramona Sauter<br>3329 Collier Pt<br>Atlanta GA 30019 | $ | 25,000.00 |
| Ramona J Sauter | Ramona J Sauter<br>3329 Collier Pt<br>Atlanta GA 30019 | $ | 25,000.00 |
| Rob Vaka | Rob Vaka<br>140 Stone Pond Lane<br>Alpharetta  GA 30022 | $ | 25,000.00 |
| Frank or Margaret Wilder | Frank or Margaret Wilder<br>3434 Rhett Butler<br>Hernando MS 38632 | $ | 25,000.00 |
| Steve Wilder | Steve Wilder<br>3862 Montford Drive<br>Chamblee GA 30341 | $ | 25,000.00 |
| William D. Walsh | William D. Walsh<br>4920 Hadaway Rd<br>Kennesaw GA 30152 | $ | 24,354.12 |
| Ted Crowder | Ted Crowder<br>1045 Grimes Bridge Rd.<br>Roswell GA 30075 | $ | 24,225.22 |
| Katherine Pheasant | Katherine Pheasant<br>1099 Lanier Blvd<br>Atlanta GA 30306 | $ | 21,813.03 |
| Brandon Ashkouti | Century Springs West<br>6000 Lake Forrest Dr., Ste 400<br>Atlanta GA 30328 | $ | 20,000.00 |
| Barclay T Resler III | Barclay T Resler III<br>7775 Walton Parkway<br>New Albany OH 43054 | $ | 17,500.00 |
| Charlie Shikany-custodial | Michael Shikany, Custodian<br>1715 N Holly Ln.<br>Atlanta GA 30329-3523 | $ | 16,500.00 |
| Kelli & Kevin Sullivan | Century Springs West<br>6000 Lake Forrest Dr., Ste 400<br>Atlanta GA 30328 | $ | 15,000.00 |
| Michael Shikany | Michael Shikany<br>1715 N Holly Ln<br>Atlanta GA 30329 | $ | 15,000.00 |
| Darius Soodmand | Darius Soodmand<br>1765 Mayfield Rd<br>Alpharetta GA 30009 | $ | 15,000.00 |
| Interactive Insurance Solutions, Inc. | Interactive Insurance Solutions, Inc.<br>C/O Mr. John Todd<br>729 Ragsdale Rd.<br>Sharpsburg GA 30277 | $ | 15,000.00 |

| | | | |
|---|---|---|---|
| Skylar E Sullivan | Century Springs West<br>6000 Lake Forrest Dr., Ste 400<br>Atlanta GA 30328 | $ | 12,000.00 |
| John Todd | Mr. John Todd<br>729 Ragsdale Rd<br>Sharpsburg GA 30277 | $ | 12,000.00 |
| Gracyn Sullivan | Century Springs West<br>6000 Lake Forrest Dr., Ste 400<br>Atlanta GA 30328 | $ | 10,000.00 |
| Christa Shikany | Christa Shikany<br>1914 Timothy Dr NE<br>Atlanta GA 30329 | $ | 10,000.00 |
| Andrew C Norwood | Andrew C Norwood<br>510 S Washington St<br>Denver CO 80209 | $ | 8,523.54 |

**EXHIBIT A-2**

**LIST OF NON NOTEHOLDER UNSECURED DEBT AND AMOUNTS**

| | |
|---|---|
| Ackerman, LLP | $12,106.45 |
| Cozen O'Conner | $87,345.25 |
| Glass Ratner | $17,500.00 |
| William Ullman, P.C. | $ 1, 571.82 |
| Williams Lopato, PLLC | $46, 830.63 |
| FedEx TechConnect, Inc. | $ 1,064.30 |

**EXHIBIT B-1**
**AMENDED AND RESTATED OPERATING AGREEMENT OF FACTEON, LLC**

## AMENDED AND RESTATED OPERATING AGREEMENT OF
## FACTEON, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT**, dated as of _____, 2015 (the "Effective Date") is adopted, executed, and agreed to, for good and valuable consideration, by the Member (as defined below).

## ARTICLE I
## DEFINITIONS

1.01    Definitions.    The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

"Articles of Organization" means the Articles of Organization of Facteon, LLC, as filed with the Secretary of State of Georgia as the same may be amended from time to time.

"Capital Account" means, with respect to the Member, the Capital Account maintained in accordance with the provisions of this Operating Agreement relating to the maintenance of Capital Accounts and the provisions of Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  The Member also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Operating Agreement not to comply with Regulations Section 1.704-1(b).

"Capital Contribution" means any contribution, as defined in O.C.G.A. §14-11-101(4), to the capital of the Company in cash or property by the Member whenever made.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means Facteon, LLC.

"Georgia Act."  The Georgia Limited Liability Company Act at O.C.G.A. §14-11-100, et seq.

"Member" shall refer to Facteon Holdings LLC, the sole member of the Company.

"Membership Interest."  A Member's entire interest in the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Member granted pursuant to this Operating Agreement or the Georgia Act.

"Operating Agreement."  This Amended and Restated Operating Agreement as originally executed and as amended from time to time.

"Person."  Any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves."  With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Member for working capital and to pay taxes, insurance, debt service or other costs or expenses incident of the ownership or operation of the Company's business.

"Treasury Regulations" or "Regulations".    The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE II
## FORMATION OF COMPANY

2.01  Formation.  The Company was formed by its organizer as a Georgia Limited Liability Company by executing and delivering articles of organization to the Secretary of State of Georgia in accordance with the provisions of the Georgia Act.

2.02  Name.  The name of the Company is Facteon, LLC.

2.03  Principal Place of Business.  The principal place of business of the Company within the State of Georgia is, 700 Galleria Parkway, Suite 440, Atlanta, Georgia, 30339.  The Company may locate its places of business and registered office at any other place or places as the Member may from time to time deem advisable.

2.04  Registered Office and Registered Agent.  The Company's initial registered office shall be at the office of its registered agent at 700 Galleria Parkway, Suite 440, Atlanta, Georgia, 30339.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Georgia Act and the applicable rules promulgated thereunder.

2.05  Term.  The term of the Company shall commence on the date the Articles of Organization were filed with the Secretary of State of Georgia and shall continue thereafter in perpetuity unless earlier dissolved in accordance with the provisions of this Operating Agreement or the Georgia Act.

## ARTICLE III
## BUSINESS OF COMPANY

3.01  Permitted Businesses.  The business of the Company shall be:

(a)      To own and operate a factoring business.

(b)      To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Georgia Act.

(c)      To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

**ARTICLE IV**
**NAMES AND ADDRESS OF MEMBER**

4.01    <u>Member's Name and Address</u>.  The name and address of the sole Member is as follows:

Facteon Holdings, LLC              700 Galleria Parkway,
                                  Suite 440
                                  Atlanta, Georgia  30339

**ARTICLE V**
**RIGHTS AND DUTIES OF MEMBER**

5.01    <u>Management</u>.  The business and affairs of the Company shall be managed by the Member.  The Member shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, all in accordance with the terms hereof.

5.02    <u>Liability for Certain Acts</u>.  The Member shall act in a manner it believes in good faith to be in the best interest of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  The Member is not liable to the Company for any action taken in managing the business or affairs of the Company if it performs the duty of his office in compliance with the standard contained in this Section.  The Member shall not be liable to the Company for any loss or damage sustained by the Company except loss or damage resulting from intentional misconduct or knowing violation of law or a transaction for which the Member received a personal benefit in violation or breach of the provisions of this Operating Agreement.  The Member shall be entitled to rely on information, opinions, reports or statements, including, but not limited to, financial statements or other financial data prepared or presented in accordance with the provisions of O.C.G.A. §14-11-305.

5.03    <u>Member Has No Exclusive Duty to Company</u>.  The Member shall not be required to manage the Company as its sole and exclusive function and he may have other business interests and may engage in other activities in addition to those relating to the Company.  The Member shall incur no liability to the Company as a result of engaging in any other business or venture.

5.04    <u>Bank Accounts</u>.  The Member may from time to time open bank accounts in the name of the Company.

5.05    <u>Indemnity of the Member</u>.  To the fullest extent permitted under O.C.G.A. §14-11-306, the Company shall indemnify the Member and make advances for expenses to him with respect to such matters to the maximum extent permitted under applicable law.

**ARTICLE VI**
**LIABILITIES OF MEMBER**

6.01 <u>Limitation on Liability</u>.  The Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

6.02 <u>No Liability for Company Obligations</u>.  The Member will not have any personal liability for any debts or losses of the Company beyond his Contributions, except as provided by law.

6.03 <u>Loans to Company</u>.  Nothing in this Operating Agreement shall prevent the Member from making secured or unsecured loans to the Company by agreement with the Company on such terms as may be approved by the Member.

## ARTICLE VII
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

The Member may make Capital Contributions to the Company at such times and in such as the Member may determine.

## ARTICLE VIII
## DISTRIBUTIONS

8.01 <u>Distributions.</u>  All distributions shall be made at such times and in such amounts as the Member may determine.

8.02 <u>Limitation Upon Distributions.</u>  No distribution shall be made to the Member if prohibited by O.C.G.A.§ 14-11-407.

## ARTICLE IX
## BOOKS AND RECORDS

9.01 <u>Accounting Period.</u>  The Company's accounting period shall be the calendar year.

9.02 <u>Records.</u>  At the expense of the Company, the Member shall maintain records and accounts of all operations and expenditures of the Company and those records required by the Georgia Act.  The Company shall keep such records at its principal place of business.

9.03 <u>Fiscal Year</u>.  The Company's fiscal year, which shall be the calendar year.

9.04 <u>Tax Returns.</u>  At the expense of the Company, the Member shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.

## ARTICLE X
## TRANSFERABILITY

10.01 <u>Transferability</u>.  The Member shall have the right to:

(a)      sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

(b)      gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law),

all or part of its Membership Interest.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.01   Dissolution.   The Company shall be dissolved upon the occurrence of any of the following events:

(i)      the decision of the Member; or

(ii)      by the withdrawal, removal, bankruptcy, insolvency, death or incompetency of the Member, the sale or redemption of the Member's entire Membership Interest, or the occurrence of any other event which terminates the continued membership of the Member in the Company pursuant to O.C.G.A. §14-11-601 or any other provision of the Georgia Act (a "Withdrawal Event"), unless within 90 days after the Withdrawal Event the personal representative of the Member agrees in writing to continue the Company and to admit itself or some other Person as a member of the Company effective as of the date of the occurrence of the event that terminated the continued membership of the Member.

11.02   Effect of Dissolution.   Upon dissolution, the Company shall cease to carry on its business, except as permitted by O.C.G.A. §14-11-605. Upon dissolution, the Member shall file a statement of commencement of winding up pursuant of O.C.G.A. §14-11-606 and publish the notice permitted by O.C.G.A. §14-11-608.

11.03   Winding Up, Liquidation and Distribution of Assets.

(a)      Upon dissolution, the Member shall immediately proceed to wind up the affairs of the Company.

(b)      If the Company is dissolved and its affairs are to be wound up, the Member shall:

(i)      Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Member may determine to distribute any assets to the Members in kind, if any),

(ii)      Discharge all liabilities of the Company, including liabilities to the Member as a creditor, to the extent otherwise permitted by law, and establish such Reserves as may be reasonably necessary to provide for contingent or other liabilities of the Company,

(iii)      Distribute the remaining assets to the Member.

(c)     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(d)     The Member shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

11.04   Certificate of Termination.   When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Member, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A. §14-11-610.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

12.01   Application of Georgia Law.   This Operating Agreement and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Georgia Act.

12.02   Construction.   Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

12.03   Headings.   The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

12.04   Waivers.   The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

12.05   Severability.   If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

12.06   Heirs, Successors and Assigns.   Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

12.07   Creditors.   None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

12.08  <u>Federal Income Tax Elections</u>.  All elections required or permitted to be made by the Company under the Code shall be made by the Member as determined in its sole discretion. For all purposes permitted or required by the Code, the Member shall act as the Tax Matters Partner.

12.09  <u>Amendments</u>.  Any amendment to this Operating Agreement shall be made in writing and signed by the Member.

12.10  <u>Time</u>.  TIME IS OF THE ESSENCE OF THIS AGREEMENT, AND TO ANY PAYMENTS, ALLOCATIONS AND DISTRIBUTIONS SPECIFIED UNDER THIS AGREEMENT.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** this Agreement has been signed, sealed and delivered as of this _____ day of _____, 2015.

<u>**MEMBER:**</u>

FACTEON HOLDINGS LLC

By:_____(SEAL)
Name:_____
Title:_____

K:\9178\1\PLAN DOX-FINAL\Exhbits\operating agreement (Facteon LLC).doc

**EXHIBIT B-2**
**OPERATING AGREEMENT OF FACTEON HOLDINGS, LLC**

# OPERATING AGREEMENT
## OF
## FACTEON HOLDINGS LLC

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AS AMENDED, IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 10-5-11(14) OF SUCH ACT.  IN ADDITION, THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED WITH THE SECURITIES COMMISSION OF CERTAIN STATES IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION.   THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS OPERATING AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.

**THIS OPERATING AGREEMENT** is made and entered into for good and valuable consideration effective _____, 2015 (the "Effective Date") by the parties who have executed counterparts of this Operating Agreement as indicated on the signature pages attached.

## ARTICLE I.
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

"Accountants" means a firm of independent certified public accountants approved by the Manager and engaged from time to time by the Company.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Operating Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)     Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4)-(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Affiliate." means (a) in the case of an individual, any relative of such Person, (b) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such Person; (c) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (d) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Articles of Organization."  The Articles of Organization of Facteon Holdings, LLC, as filed with the Secretary of State of Georgia, as the same may be amended from time to time in accordance with paragraph 15.15 of this Operating Agreement.

"Board of Managers."  Collectively, the Managers designated pursuant to this Operating Agreement from time to time.

"Business."  The business of factoring accounts receivable, back office corporate medical compliance, and asset recovery.  The business may be conducted through Subsidiaries.

"Capital Account."  A capital account maintained in accordance with the rules contained in Section 1.704-1(b)(2)(iv) of the Regulations, as amended from time to time.

"Capital Contribution."   Any contribution to the capital of the Company in cash or property by a Member whenever made.

"Code."  The Internal Revenue Code of 1986, as amended from time to time.

"Company."  Facteon Holdings LLC, a Georgia limited liability company.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership of securities, by contract or otherwise.

"Distributable Cash."  All cash received by the Company from Company operations, plus any cash that becomes available from Reserves, and all cash proceeds, net of expenses, from all sales or other dispositions and refinancings of the property of the Company, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the operation of the Company's business; and (iii) Reserves.  The Managers shall cause each Subsidiary to distribute its "distributable cash" to the Company on a quarterly basis.

"Economic Interest."  A Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and rights to distributions of the Company's assets

pursuant to this Operating Agreement and the Georgia Act, but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members.

"Economic Interest Owner."  The owner of an Economic Interest who is not a Member.

"Entity."   Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Event of Dissociation."  Any of the events specified in Section 601.1 of the Georgia Act or Section 14.1 herein.

"Financial Statements and Reports" means, on  quarterly and annual basis in accordance with Section 11.4 hereof, all applicable income statements, balance sheets, and cash flow statements.

"Fiscal Year."  The Company's fiscal year, which shall be the calendar year.

"Georgia Act."  The Georgia Limited Liability Company Act at O.C.G.A. §14-11-100, et seq.

"Gross Asset Value."  With respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset as determined by Bobby Whirley for the notes contributed to the Company as part Company's bankruptcy plan (and if Bobby Whirley is unable or unwilling to provide such valuation then by such other Person designated by the Board of Managers) and as determined by the Accoutants for any other contributions;

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Accountants as of the following times: (a) the acquisition of an additional interest in the Company after the date hereof by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Board of Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution; and

(d)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in

determining capital accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 10.2 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this section to the extent the Board of Managers determine that an adjustment pursuant to paragraph (b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a), (b), or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Guaranteed Payments" means any salary payments to Officers and/or Managers who are Members.

"Initial Capital Contribution."  The initial contribution to the capital of the Company made by a Member set forth on Exhibit "A" attached hereto.

"Interest."  Any interest in the Company, including a Membership Interest, an Economic Interest, any right to vote or participate in the business of the Company, or any other interest in the Company.

"Issuance Items."  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest by the Company to a Member.

"Majority Interest."  Ownership Interests of Members which, taken together, constitute more than fifty percent (50%) of the Ownership Percentages.

"Majority Vote."  In the case of Members, the vote or written consent of Members holding more than fifty percent (50%) of the Ownership Percentages held by all Members entitled to vote on or consent to the issue in question.  In the case of the Board of Managers, the vote or written consent of voting Managers representing a majority of all the Managers of the Company entitled to vote on or consent to the issue in question. For purposes of the provisions hereof relating to actions taken or approval by Members, including voting, written consents or other approval, only Ownership Percentages held by Members shall be taken into account.

"Manager(s)."  One or more managers designated to serve on the Board of Managers pursuant to this Operating Agreement.

"Member."  Each Person who executes this Operating Agreement or a counterpart thereof as a Member and each of the Persons who may hereafter become Members as provided in this Operating Agreement.  If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Interest.

"Membership Interest." A Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any

- 4 -

decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act. The Membership Interest shall be denominated in Units.

"Minimum Gain." As defined in Treasury Regulation § 1.704-2(d) of the Code.

"Net Profits" and "Net Losses." The Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Year (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss); provided, such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B) and 705(a)(2)(B)) were included in the computation of taxable income or loss. If any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes to the Company, or if Company property is revalued pursuant to Section 1.704-1(b)(2)(iv)(f) of the Regulations or as otherwise required by the Regulations, Net Profits and Net Loses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation. Credits or debits to Capital Accounts due to a revaluation of Company assets in accordance with Section 1.704-1(b)(2)(iv)(f) of the Regulations, or due to a distribution of noncash assets, will be taken into account as gain or loss from the disposition of such assets for purposes of Article IX hereof.

"Nonrecourse Debt Minimum Gain." An amount, with respect to each Member nonrecourse debt, equal to the Company Minimum Gain that would result if such Member's nonrecourse debt were treated as a nonrecourse liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Officer." One or more individuals appointed by the Board of Managers to whom the Managers delegate specified responsibilities. The Officers shall have such duties as set forth in this Operating Agreement and as are assigned to them by the Board of Managers from time to time. All Officers shall serve at the pleasure of the Board of Managers and the Board of Managers may remove any Officer from office without cause and any Officer may resign at any time upon written notice to the Board of Managers.

"Operating Agreement." This Operating Agreement, as originally executed, and as amended from time to time in accordance with paragraph 15.15 of this Operating Agreement.

"Ownership Percentage." means, with respect to each Member, the quotient of (A) total Capital Contributions of such Member *divided by* (B) the total Capital Contributions of all Members. The initial Ownership Percentage of the Members are as set forth on <u>Exhibit "A"</u> attached hereto. The Ownership Percentage of the Members shall be adjusted from time to time in the manner set forth in this Agreement.

"Person." Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves."  Funds set aside and amounts allocated to reserves in amounts determined by the Board of Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Subsidiary." Any Entity in which the Company has a direct or indirect interest.

"Supermajority Vote."  In the case of Members, the vote or written consent of Members holding more than sixty-seven percent (67%) of the Ownership Percentages held by all Members entitled to vote on or consent to the issue in question**.**  For purposes of the provisions hereof relating to actions taken or approval by Members, including voting, written consents or other approval, only Ownership Percentages held by Members shall be taken into account.

"Tax Matters Member."  The person appointed by the Board of Managers pursuant to Section 15.12 to make all elections, to sign all returns and to perform all other acts or purposes permitted or required by the Code.

"Treasury Regulations" or "Regulations."  The federal income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Units" shall mean the denomination of Membership Interests. Each Member shall receive one vote per Unit.

"Withdrawing Member."  A Member who suffers or incurs an Event of Dissociation or whose status as a Member is otherwise terminated.

## ARTICLE II.
## FORMATION OF THE COMPANY

2.1.    Formation.  The Company was formed as a Georgia limited liability company by the filing of the Articles of Organization with the Secretary of State of Georgia in accordance with the provisions of the Georgia Act.

2.2.    Name.  The name of the Company is "Facteon Holdings, LLC".

2.3.    Principal Place of Business.  The principal place of business of the Company within the State of Georgia is 700 Galleria Parkway, Suite 440, Atlanta, Georgia, 30339.  The Company may locate its places of business and registered office at any other place or places as the Board of Managers may from time to time deem advisable.

2.4.    Registered Office and Registered Agent.  The Company's current registered office shall be 1100 Peachtree Street, Suite 800, Atlanta, Georgia, 30309.  The current registered agent is John A. Christy, Esq.  The registered office and registered agent may be changed from time to time pursuant to the Georgia Act and the applicable rules promulgated thereunder.

2.5.  Term.  The term of the Company commenced on the date the Articles of Organization were filed with the Secretary of State of Georgia and shall continue until the Company is dissolved and its affairs wound up on accordance with the provision of this Operating Agreement of the Georgia Act.

## ARTICLE III.
## BUSINESS OF COMPANY

3.1  Purposes.  The purpose of the Company shall be to engage in the Business and to own the membership interests of Facteon, LLC, Facteon Asset Recovery, LLC and Comply First, LLC.  The Company may also establish additional Subsidiaries to engage in the Business.

3.2  Powers.  The Company shall have any and all powers which are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Georgia Act.  The Company shall carry out the foregoing activities pursuant to the provisions set forth in the Articles of Organization and this Operating Agreement.

## ARTICLE IV.
## NAMES AND ADDRESSES OF INITIAL MEMBERS

The name and address of each of the current Members is set out on Exhibit A attached hereto and incorporated herein.

## ARTICLE V.
## RIGHTS AND DUTIES OF MANAGERS AND OFFICERS

5.1.  Management.  The business and affairs of the Company shall be managed by its Board of Managers, as such authority may be delegated by authority and responsibilities to designated officers in Section 5.3.  Except as set forth in this Operating Agreement, the Board of Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At any time when there is more than one Manager, all decisions and actions of the Board of Managers shall be approved by a Majority Vote except as otherwise expressly provided herein. In all cases, the Board of Managers may act by written consent by a Majority Vote and such consent shall have the same effect as a vote taken at a duly called meeting.

5.2.  Number, Tenure and Qualifications.  The Board of Managers shall initially consist of seven (7) Managers as set out on Exhibit B. A Manager shall serve until such time as his resignation, removal or death or incompetency pursuant to Section 601.1(b)(6) of the Georgia Act or until such Manager's successor is duly elected and qualified.  Subject to the foregoing, the number of Managers of the Company may be increased to as many as nine (9) or decreased to no fewer than five (5) by consent of a Majority Vote of the Members.  The initial Managers shall serve until the first annual meeting of the Members.  At the first annual meeting, the Members

- 7 -

will elect Managers who shall be divided into three (3) classes, designated Class I, Class II and Class III (which at all times shall be as nearly equal in number possible). Except for the Initial Managers each Manager shall serve for a term ending on the date of the third annual meeting of Members following the annual meeting at which the Manager was elected; provided, that each Manager initially appointed as a Class I Manager shall serve for an initial term expiring at the second annual meeting of Members, each Manager initially appointed as a Class II Manager shall serve for an initial term expiring at the third annual meeting of Members, and each Manager initially appointed as a Class III Manager shall serve for an initial term expiring at the fourth annual meeting of Members.

5.3.    <u>Certain Powers of Chief Executive Officer and the President</u>.  Subject to Section 5.12, the Chief Executive Officer shall have power and authority, on behalf of the Company, to take the following actions:

(a)    To purchase liability and other insurance to protect the Company's property and its business.

(b)    To hold and own any Company real and/or personal properties in the name of the Company.

(c)    To invest any Company funds (by way of example but not limitation) in time deposits, short-term government obligations, commercial paper or other investments.

(d)    To execute on behalf of the Company all instruments and documents, including, without limitation: checks, drafts, negotiable instruments (other than notes); documents providing for the acquisition or disposition of the Company's assets, assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of such Officers, to the business of the Company.

(e)    To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Board of Managers may approve.

(f)    To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds.

(g)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Except as provided herein or as authorized by the Board of Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

5.4.    <u>Liability for Certain Acts</u>. No Manager has guaranteed or shall have any obligation with respect to the return of a Member's Capital Contributions or profits from the

operation of the Company.  No Manager shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member except loss or damage resulting from intentional misconduct or knowing violation of law or a transaction for which such Manager received a personal benefit in violation or breach of the provisions of this Operating Agreement.  Each Manager shall be entitled to rely on information, opinions, reports or statements, including but not limited to financial statements or other financial data prepared or presented by: (i) any one or more Members, Managers, Officers or employees of the Company whom the Board of Managers reasonably believe to be reliable and competent in the matter presented, (ii) legal counsel, public accountants, or other persons as to matters the Board of Managers reasonably believes are within the person's professional or expert competence, or (iii) a committee of Managers of which he or she is not a member if the Board of Managers reasonably believe the committee merits confidence.

5.5.    <u>Managers Have No Exclusive Duty to Company</u>. A Manager shall not be required to manage the Company as that Manager's sole and exclusive function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company.  The Managers shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or ventures.

5.6.    <u>Bank Accounts</u>. The Managers may from time to time open bank checking, savings and trust accounts in the name of the Company.  The designated Officers shall be the sole signatories thereon.  The Managers may also cause any Subsidiary to open bank checking, savings and trust accounts in the name of the applicable Subsidiary.  Unless approved by a Majority Vote of the Managers, no Manager shall have the authority to open accounts relating to loans, lines or credit or other liabilities of the Company.  The Managers shall provide the Members with  a list of bank accounts and signatories upon request.

5.7.    <u>Indemnity of the Managers, Members, Tax Matters Member, Officers, Employees and Other Agents</u>. To the fullest extent permitted by Section 306 of the Georgia Act, the Company shall indemnify, defend and hold harmless, each Manager and Member and make advances for expenses to each Manager and Member arising from any loss, cost, expense, damage, claim or demand, actual or threatened, in connection with the Company, the Managers' or Members' status as a Manager or Member of the Company, the Managers' or Members' participation in the management, business and affairs of the Company, such Managers' or Members' activities on behalf of the Company.  To the fullest extent permitted by Section 306 of the Georgia Act, the Company may also indemnify its Tax Matters Member, Officers, employees and other agents who are not Managers or Members arising from any loss, cost, expense, damage, claim or demand, in connection with the Company, any such Person's participation in the business and affairs of the Company or such Person's activities on behalf of the Company.  The Company shall purchase and maintain directors and officers liability insurance, at its expense, any Person who is or was serving as a Manager, Tax Matters Member, Officer, or is or was serving at the request of the Company as a Manager, Tax Matters Member, Officer, director or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this section.

5.8.    <u>Resignation, Removal, Vacancy and Salary of Managers</u>.

(a)    <u>Resignation.</u>  A Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The resignation of a Manager as a manager shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of the Manager as a Member or an Event of Dissociation as to the Manager.

(b)    <u>Removal</u>. At a meeting called expressly for that purpose, any Manager may be removed with or without reason by the Majority Vote of the Members.  For purposes of this Section 5.8(b), "cause" shall mean conviction (or, in the case of clause (ii) and (iii) immediately following, a civil adjudication to the same effect) of the Manager for commitment of (i) a felony, (ii) fraud against the Company, or (iii) intentional misconduct which causes a material adverse consequence to the Company. The removal of a Manager as a manager shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of the Manager as a Member or an Event of Dissociation as to the Manager.

(c)    <u>Vacancies</u>.

(i)    In case any vacancy shall occur on the Board of Managers because of death, resignation or removal, such vacancy may be filled by a majority of the Managers remaining in office (though less than a quorum) or by the sole remaining Manager. The Manager so appointed shall serve for the unexpired term of his predecessor or until his successor is elected and qualified or until his earlier death, resignation or removal.

(ii)     Any vacancy resulting from any increase in the number of Managers constituting the whole Board may be filled by a majority of the Managers then in office (though less than a quorum), or by the sole remaining Manager. The Manager so appointed shall be assigned to such class of managers as such majority of Manager, or the sole remaining Manager, as the case may be, shall determine; provided however, that newly-created manager positions shall be apportioned among the classes of Managers so that all classes will be as nearly equal in number as possible. Each Manager so appointed shall hold office until his successor is elected and qualified or until his earlier death, resignation or removal.

(iii)    Except as otherwise provided by law or this Operating Agreement,the Members shall not have any right to fill vacancies on the Board of Managers, including newly-created manager positions.

- 10 -

(h)       <u>Salaries</u>. The Managers shall not receive any compensation for their service as Managers but each Manager shall be entitled to receive reimbursement for all necessary and reasonable out-of-pocket expenses incurred by such Manager in the course of his or her service as a Manager.

5.9.    <u>Officers</u>.

(a)      <u>Appointment and Tenure</u>.

(i)      The Officers of the Company shall consist of a Chief Executive Officer, and a Chief Operating Officer.

(ii)      The Officers of the Company shall be comprised of one or more individuals designated from time to time by the Board of Managers. No Officer need be a resident of the State of Georgia. Each Officer shall hold his offices for one (1) year terms and shall have such authority and exercise such powers and perform such duties as shall be determined from time to time by the Board of Managers. Any number of offices may be held by the same individual. The salaries or other compensation, if any, of the Officers and agents of the Company shall be fixed from time to time by the Board of Managers.

(iii)      The Board of Managers may also designate a secretary and a treasurer and one or more vice presidents, assistant secretaries and assistant treasurers. The Board of Managers may designate such other officers and assistant officers and agents as the Board of Managers shall deem necessary.

(b)      <u>Chief Executive Officer</u>. The Chief Executive Officer shall have general and active management of the day-to-day business and affairs of the Company as authorized from time to time by the Board of Managers and shall be authorized and directed to implement all orders, resolutions and business plans adopted by the Board of Managers. The Chief Executive Officer shall perform such other duties as the Board of Managers may from time to time determine.

(c)      <u>Chief Operating Officer</u>. The Chief Operating Officer shall perform such senior duties in connection with the operations of the Company as the Chief Executive Officer shall from time to time determine.

(d)      <u>Other Officers</u>. There shall be such other officers as the Board of Managers may appoint from time to time, including without limitation a secretary, assistant secretaries, and vice presidents. They shall perform such other duties and have such other authority and powers as the Board of Managers may from time to time prescribe.

5.10.    <u>Appointment of Initial Officers</u>. The following individuals are appointed by the Board of Managers to the offices set forth beside their respective names:

_____            Chief Executive Officer and

- 11 -

_____          Chief Operating Officer

5.11.  Resignation, Removal, Vacancy and Salary of Officers.

(a)   Resignation.  Any Officer of the Company may resign at any time by giving written notice to the Board of Managers of the Company. The resignation of any Officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of an Officer as an Officer shall not affect that Officer's rights as a Member and shall not constitute a withdrawal of the Officer as a Member or an Event of Dissociation as to the Officer.  In the event of resignation, the Board of Managers shall have the authority to appoint a successor.

(b)   Removal. An Officer may be removed, with or without cause at any time, by a Majority Vote of the Board of Managers. The removal of an Officer as an Officer shall not affect that Officer's rights as a Member and shall not constitute a withdrawal of the Officer as a Member or an Event of Dissociation as to the Officer.

(c)   Vacancies. Any vacancy occurring in an office shall be filled by the Board of Managers.

(d)   Salaries.  The salary and other compensation of the Officers shall be determined by a Majority Vote of the Board of Directors.  The salary may be changed from time to time by a Majority Vote of the Board of Managers, and no Officer shall be prevented from receiving such salary by reason of the fact that the Officer is also a Member of the Company. The salaries of Officers are not required to be equal.

5.12.  Decisions Requiring Majority Vote of Managers.  Notwithstanding anything to the contrary contained herein, neither the Chief Executive Officer nor the Chief Operating Officer, nor any other Officer shall have the power or authority to take any of the following actions without the Majority Vote of the Board of Managers:

(a)   Cause the Company or any Subsidiary to into any contracts or agreements with affiliated or related parties or Affiliates of any Manager or Officer or pay monies to same or otherwise engage in self dealing;

(b)   To provide for the distribution of Distributable Cash;

(c)   Removing, replacing or naming any Officer of the Company or any Subsidiary.

(d)   Enter into contracts which would commit or obligate the Company to expend more than $150,000.00 of Company funds;

- 12 -

(e)     Cause any Subsidiary to enter into contracts which would commit or obligate the Subsidiary to expend more than $150,000.00 of such Subsidiary's funds;

(f)     Settle or compromise any claim of the Company in excess of $10,000.00, or confess a judgment against the Company;

(g)     Cause the Company or any Subsidiary to make loans to any Person;

(h)     Cause the Company or any Subsidiary to obtain any loan or guaranty any debt;

(i)     Cause the Company or any Subsidiary to sell assets other than in the ordinary course of business;

(j)     Cause the Company or any Subsidiary to take any other action outside the ordinary course of business, including any substantial modification of the business of the Company or its Subsidiaries outside of the Business;

(k)     Appoint the Tax Matters Member or remove the Tax Matters Member; and

(l)     To spin-off any Subsidiary.

If any of the foregoing actions are approved by the Board of Managers, the Chief Executive Officer (or such other Officer(s) as the Board of Managers may authorize) shall execute any documents necessary to carry out such actions.

5.13.   <u>Decisions Requiring Supermajority Vote of Members</u>.  Notwithstanding anything to the contrary contained herein, neither the Chief Executive Officer nor the Chief Operating Officer, nor any other Officer, nor the Board of Managers, shall have the power or authority to take any of the following actions without the Supermajority Vote of the Members:

(a)     Cause the Company or any Subsidiary to be a party to a merger, or an exchange or acquisition of the type described in section § 14-11-901 of the Georgia Act;

(b)     Cause the Company or any Subsidiary to sell all or substantially all of its assets;

(c)     Cause the Company or any Subsidiary to file for bankruptcy;

(d)     Cause the Company or any Subsidiary to liquidate;

(e)     Cause the Company or any Subsidiary to enter into any agreement that prohibits Tax Distributions.

**ARTICLE VI.**

- 13 -

## RIGHTS AND OBLIGATIONS OF MEMBERS

6.1.    <u>Limitation on Liability</u>. Each Member's liability shall be limited as set forth in the Georgia Act. No Member will have any personal liability for any debts or losses of the Company absent consent of all of the Members.

6.2.    <u>List of Members</u>. Upon written request of any Member, the Company shall provide a list showing the names, addresses and Membership Interest of all Members and the other information required by the Georgia Act and maintained pursuant to Section 11.2.

6.3.    <u>Approvals of Members</u>. Except as otherwise provided in this Operating Agreement, the actions identified in Section 14-11-308(b) of the Georgia Act may be taken by the Managers without any further consent or approval of the Members.

## ARTICLE VII.
## MEETINGS

7.1.    <u>Meetings</u>.  Meeting of the Board of Managers and Members shall be governed by Section 309 through 312 of the Georgia Act except as otherwise provided in this Operating Agreement.

7.2.    <u>Annual Meeting of the Members</u>.  The first annual meeting of the Members will be held within six (6) months of the effective date of the Company's bankruptcy plan and annually thereafter. The annual meeting shall be held at such time and place and on such date as the Board of Managers shall determine from time to time and as shall be specified in the notice of the meeting.

7.3.    <u>Call of Meetings</u>.  Special meetings of the Board of Managers and Members, for any purpose or purposes, may only be called by any Manager or by a Member (or Members) holding more than 50% of the Ownership Percentages.  The removal and replacement of any Manager may be on the agenda at any special meeting of the Members.

7.4.    <u>Place of Meetings</u>. The place of meeting shall be the principal executive office of the Company in the State of Georgia unless the Board of Managers specify a place within a thirty (30) mile radius of such executive office.

7.5.    <u>Record Date</u>. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which such distribution is made, as the case may be, shall be the record date for such determination of Members unless the Board of Managers shall otherwise specify another record date.

7.6.    <u>Quorum</u>. A majority of the voting Managers shall constitute a quorum at any meeting of the Board of Managers.  Members holding a Majority Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members.  In the absence of a quorum

at a meeting of Members, a majority of the Ownership Percentages so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if at the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Ownership Percentages whose absence would cause less than a quorum to be present. If a quorum is present, the affirmative vote members holding a majority of the Ownership Percentages represented at the meeting and entitled to vote on the subject matter shall be the act of the Members, except as otherwise provided by law, by the Articles of Organiation of the Company or by this Operating Agreement. All elections of Managers shall be determined by a plurality of the votes cast by Members entitled to vote in such elections.

7.7.   <u>Conflicting Interests</u>. Section 307 of the Georgia Act shall not apply in the case of the Managers or the Members who have an interest (economic or otherwise) in the outcome of any particular matter. Their vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved.

7.8.   <u>Proxies</u>. A Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such written proxy shall be delivered to the Company. No Manager may vote by proxy.

7.9.   <u>Action Without a Meeting</u>. All actions which may be taken at a meeting of the Members or the  Managers may be taken without a meeting if the action is taken without a meeting by Members or Managers, as the case may be, representing the voting power to cast not less than the minimum number of votes necessary to authorize such action if taken at a meeting at which all Members or the Managers, as the case may be, entitled to vote were present and voted.

7.10.   <u>Conference Telephone Calls</u>. Members of the Board of Managers may participate in a meeting of such Board by means of a conference telephone, video conferencing or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time and participation by such means shall constitute presence in person at a meeting.

**ARTICLE VIII.**
**CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS**

8.1   <u>Members' Capital Contributions</u>. Each Member shall contribute the property set forth in <u>Exhibit A</u> hereto as the Member's Initial Capital Contribution:

In exchange for such Capital Contributions each Member shall be issued such Units of Membership Interests as set forth opposite his or her name on <u>Exhibit A</u> and each Member will be credited with an initial capital account determined by the Accountants utilizing the Gross Asset Values determined in accordance with the definition Gross Asset Value.

8.2     Additional Contributions.  No Member shall be required or permitted to make any additional Capital Contributions.

8.3     Loans to Company. To the extent approved the Board of Managers, any Member may make a secured or unsecured loan to the Company, provided that any such loan shall not be deemed an additional capital contribution to the Company.

## ARTICLE IX.
## DISTRIBUTIONS TO MEMBERS

9.1.     Distributions.  Distributable Cash, if any, shall be distributed to the Members, pro rata, in accordance with their Ownership Percentages.  Distributable Cash for each calendar quarter shall be distributed to the Members on or before the 15th day after the end of each such calendar quarter.

9.2.     Tax Distributions. The Company shall make a tax distributrion to the Members within four (4) months after the close of each Fiscal Year (the "Tax Distribution").  The Tax Distribution shall be distributed to to the Members, pro rata, in accordance with their Ownership Percentages.  The amount of the Tax Distribution shall be equal to the product of (i) the Company's taxable income for the prior Fiscal Year multiplied by (ii) 45%. The Tax Distribution shall be reduced by the amount of any distributions made to the Members under Section 9.1 during the prior Fiscal Year.

9.3.     Limitation Upon Distributions. No distribution shall be made to Members if prohibited by Section 407 of the Georgia Act

## ARTICLE X.
## ALLOCATIONS OF NET PROFITS AND NET LOSSES

10.1     Net Profits and Net Losses.  Net Profits and Net Losses shall be allocated, after giving effect to Sections 10.2 and 10.3, as follows:

(a)     Net Profits for any Fiscal Year shall be allocated pro rata, based upon the Ownership Percentage of each Member as set forth herein.

(b)     Net Losses for any Fiscal Year shall be allocated in the following order and priority:

(i)     Except as provided in Section 10.1(b)(ii) hereof, to the Members pro rata based upon their respective Ownership Percentages as set forth herein.

(ii)     The Net Losses allocated pursuant to Section 10.1(b)(i) hereof shall not exceed the maximum amount of Net Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event that some but not all of the Members would have an Adjusted Capital Account Deficit as a

consequence of the allocation of Net Losses pursuant to Section 10.1(b)(i) hereof, the limitations set forth in this Section 10.1(b)(ii) shall be applied, on a Member by Member basis, so as to allocate the maximum permissible Net Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).  All Net Losses in excess of the limitations set forth in this Section 10.1(b)(ii) shall be allocated to the Members pro rata based upon their respective Ownership Percentages as set forth herein.

      10.2   <u>Special Allocations</u>.  The following special allocations shall be made in the following order:

      (a)   Minimum Gain Chargeback.  Except as otherwise provided in Regulations Section 1.704-2(f), and notwithstanding any other provision of this Article X, if there is a net decrease in Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of income and gain for that Fiscal Year (and, if necessary subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Minimum Gain, determined in accordance with Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 10.2(a) is intended to comply with the Minimum Gain Chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

      (b)   Member Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, and notwithstanding any other provisions of this Article X, if there is a net decrease in Nonrecourse Debt Minimum Gain during a Fiscal Year, each Member who has a share of the Nonrecourse Debt Minimum Gain attributable to such Member's nonrecourse debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Nonrecourse Debt Minimum Gain attributable to such Member's nonrecourse debt, determined in accordance with Regulations Sections 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 10.2(b) is intended to comply with the Minimum Gain Chargeback requirement of Regulations Section 1.704-2(i)(4), and shall be interpreted consistently therewith.

      (c)   Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 10.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article X have been tentatively made as if this Section 10.2(c) were not in the Operating Agreement.

(d)     Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Operating Agreement and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 10.2(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article X have been made as if Section 10.2(c) hereof and this Section 10.2(d) were not in the Operating Agreement.

(e)     Member Nonrecourse Deductions.  Any Member nonrecourse deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member nonrecourse debt to which such Member nonrecourse deductions are attributable in accordance with Regulations Sections 1.704-2(i)(1).

(f)     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or (4), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interest in the Company in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(v)(m)(4) applies.

(g)     Nonrecourse Deductions.  Nonrecourse deductions for any year or other period shall be allocated to the Members, pro rata, based upon their respective Ownership Percentages.

(h)     Allocations Relating to Taxable Issuance of Membership Interest.  Any Issuance Items shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Operating Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

(i)     Guaranteed Payment Allocations.  To the extent any compensation paid to any Member by the Company, including any salaries payable to any Member, are determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or are not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), then that Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and that Member's Capital Account shall be adjusted to reflect the payment of that compensation.

10.3    Curative Allocations.  The allocations set forth in Sections 10.1(b)(ii) and 10.2(a) through (g) hereof (the "Regulatory Allocations") are intended to comply with certain

- 18 -

requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 10.3.  Therefore, notwithstanding any other provisions of this Article X (other than the Regulatory Allocations), the Tax Matters Member shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance which the Member would have had if the Regulatory Allocations were not part of the Operating Agreement and all Company items were allocated pursuant to Sections 10.1(a), 10.1(b)(i), 10.2(h) and 10.2(i).  In exercising this discretion under this Section 10.3, the Tax Matters Member will take into account future Regulatory Allocations under Sections 10.2(a) and 10.2(b), that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 10.2(e) and 10.2(g).

10.4    Other Allocation Rules.

(a)    For purposes of determining the Net Profits and Net Losses, or any other items allocable to any period, Net Profits, Net Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Tax Matters Member using the permissible method under Code Section 706 and the Regulations thereunder.

(b)    All allocations to the Members pursuant to this Article X shall, except as otherwise provided, be divided among them in proportion to the Membership Interests held by each.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article X and hereby agree to be bound by the provisions of this Article X in reporting their shares of Company income and loss for income tax purposes.

(d)    To the extent permitted by Sections 1.704-2(h)(3) of the Regulations, the Tax Matters Member shall endeavor to treat distributions of Distributable Cash as having been made from the proceeds of a nonrecourse liability or a Member nonrecourse debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

10.5    Tax Allocations:

(a)    In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

(b)    In the event the Gross Asset Value of any Company asset is adjusted, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes

and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)      Any elections or other decisions relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 10.5. are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items, or distributions pursuant to any provisions of this Operating Agreement.

## ARTICLE XI.
## BOOKS AND RECORDS

11.1.    <u>Accounting Period and Method</u>. The Company's accounting period shall be the Fiscal Year and its financial statements and books of accounting shall be kept on the accrual method.

11.2.    <u>Records and Reports</u>. At the expense of the Company, the Board of Managers shall maintain records and reports of all operations and expenditures of the Company. The Company shall keep at its principal place of business the following records:

(a)      A current list of the full name and last known address of each Member, Economic Interest Owner and Manager;

(b)      Copies of records to enable a Member to determine the relative voting rights, if any, of the Members;

(c)      A copy of the Articles of Organization of the Company and all amendments thereto;

(d)      Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(e)      Copies of this Operating Agreement, together with any amendments thereto;

(f)      Copies of any financial statements of the Company for the three most recent years;

(g)      A list of Members who have informed the Managers that they are interested in buying or selling Units.

The books and records shall at all times be maintained at the principal office of the Company and shall be open to the inspection and examination of the Members, Economic Interest Owners, or their duly authorized representatives during reasonable business hours.

11.3.    <u>Tax Returns</u>. The Board of Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Fiscal Year.

11.4.    <u>Financial Statements and Lender Notices</u>.  No later than thirty (30) days following the end of each calendar month (except for the twelfth (12th) calendar quarter, for which an annual report shall be required), the Managers shall cause to be prepared and distributed to the Members copies of the Company's and each Subsidiaries unaudited Financial Statements.  No later than nintety (90) days following the end of each Fiscal Year, the Managers shall cause to be prepared and distributed to the Members copies of the Company's and each Subsidiary's consolidated Financial Statements (the Board of Managers shall determine whether such Financial Statements will be compiled, reviewed or audited).

**ARTICLE XII.**
**<u>TRANSFERABILITY</u>**

12.1.    <u>General Prohibition</u>.  No Member or Economic Interest Owner may assign, convey, sell, transfer, liquidate, encumber, pledge, grant an interest in or in any way alienate (collectively a "Transfer") all or any part of its Interest to any Person, including any other Member (the "Transferee"), absent strict compliance with the following Sections of this Article. Any attempted Transfer of all or any portion of an Interest absent compliance with the procedures required in this Article, shall be null and void and shall have no effect whatsoever.  If a Member Transfers or attempts to Transfer an Interest in violation of this Operating Agreement or permits such Member's Interest to become subject to an involuntary lien or a charging order, such Member shall cease to be Member and become an Economic Interest Owner.

12.2    <u>Transfer with Consent</u>. Upon approval of the Managers by a Majority Vote, all or any portion of an Interest may be transferred by a Member to a Transferee in accordance with such terms and conditions as all of the Managers by a Majority Vote  shall approve.  The transferring Member and Transferee shall sign the documents required in Section 12.4 hereinafter.

12.3    <u>Transfer Without Consent</u>. Except as set forth below, a Member may Transfer all or any part of his or her Membership Interest to an Affiliate, to a family member, or to a trust naming such Affiliates and/or family members as a beneficiary thereof, upon execution of the documents required in Section 12.4.  Except as set forth below, a Member may transfer all or any part of his or her Membership Interest to another Member. Notwithstanding the foregoing, a Member may not transfer an Interest unless such transfer is exempt from registration under the securities acts described on the first page of this Operating Agreement and such transfer in compliance with all applicable securities laws.  Notwithstanding the anything to contrary in this Operating Agreement, a Member may not Transfer an Interest to any creditor, a judgment creditor  or to Fred Nort or Tom Nort or any of their Affiliates.  Notwithstanding anything to the contrary in this Operating Agreement, no more than fifty percent (50%) of the Ownership

- 21 -

Percentages may be Transferred under this Section 12.3.  The Managers shall cause the Company website to provide to lists Members who are interest in buying or selling Units.

12.4    <u>Permitted Transfers</u>.  Any Person acquiring an Interest (i) by written pursuant to Section 12.2, or (ii) by effect of Section 12.3, in each case, shall become a Member provided that:

(a)    the Transferee must have executed a short form admission amendment in the form to be provided by the Managers;

(b)    the Transferee and the transferring Member must have executed a short form assignment of membership interest in the form to be provided by the Managers.

(c)    the Transferee must have paid the reasonable expenses incurred by the Company in connection with the admission of the Transferee to the Company.

12.5    <u>Specific Performance</u>.  If any Member or Economic Interest Owner proposes to transfer all or any part of such Interest thereof in violation of the terms of this Operating Agreement, the Company or any Member may apply to any court of competent jurisdiction for an injunctive order prohibiting such proposed disposition except upon compliance with the terms of this Operating Agreement, and the Company or any other Member may institute and maintain any action or proceeding against the Member or Economic Interest Owner proposing to make such transfer to compel the specific performance of this Operating Agreement.  Any attempted transfer in violation of this Operating Agreement will be null and void and of no force and effect.  Similar injunctive relief and specific performance may be obtained by the Company or any Member against any third party to compel compliance with the terms of this Operating Agreement.  The Person against whom such action or proceeding is brought hereby waives the claim or defense that an adequate remedy at law exists, and such Person agrees not to urge in any such action or proceeding the claim or defense that such remedy at law exists.

## ARTICLE XIII.
## ISSUANCE OF ADDITIONAL MEMBERSHIP INTERESTS

Any Person approved by a Majority Vote of the Board of Managers may become a member of a Subsidiary upon the issuance by the Subsidiary of membership interests for such consideration as the Board of Managers shall determine.  Except as set forth below, any Person approved by a Majority Vote of the Board of Managers may become a Member of the Company upon the issuance by the Company of Membership Interests for such consideration as the Board of Managers shall determine.  Notwithstanding the foregoing, the Managers may not issues more than 2,000 Units during any Fiscal Year without a Supermajority Vote of the Members.

## ARTICLE XIV.
## DISSOCIATION, DISSOLUTION AND TERMINATION

14.1.    <u>Dissociation</u>.

(a)     Notwithstanding anything to the contrary contained in Section 601.1 of the Georgia Act, a Member shall cease to be a member of the Company only upon the occurrence of one of the following events:

(i)     the Member Transfers all of his Membership Interest or Economic Interest;

(ii)    the Member's entire Membership Interest in the Company is purchased or redeemed by the Company;

(iv)    the Member dies or is declared incompetent pursuant to Section 601.1(b)(6) of the Georgia Act.

(b)     Notwithstanding anything to the contrary contained in Section 601.1 of the Georgia Act, except as otherwise expressly permitted in this Agreement, a Member shall not withdraw from the Company or take any other action which causes such Member to withdraw from the Company.  A Withdrawing Member shall not be entitled to receive any distributions to which such Member would not have been entitled had such Member remained a Member, and such distributions shall be distributable to such Member only at the time (if any) such distributions would have been made had the Withdrawing Member remained a Member.

(d)     If the Company is continued after the occurrence of an Event of Dissociation pursuant to this Section, any successor in interest of the Member as to whom the Event of Dissociation occurred shall become an Economic Interest Owner but shall not be admitted as a Member except in accordance with Article XII hereof.

14.2.   Dissolution.

(a)     The Company shall be dissolved upon the occurrence of any of the following events:

(i)     by the Supermajority Vote of the Members; or

(ii)    the sale of all or substantially all of the Company's assets and the collection of all proceeds therefrom; or

(iii)   the ninetieth (90th) day after there is no Member who is a Manager, unless within such 90-day period the Company is continued by affirmative Majority Vote of the Members other than the Member as to whom the Event of Dissociation occurred.

(b)     Except as otherwise set forth in this Operating Agreement, unless otherwise approved by the Managers by a Majority Vote, a Withdrawing Member, regardless of whether such termination was the result of a voluntary act by such Withdrawing Member, shall not be entitled to receive the fair value of his Membership Interest, and such Withdrawing Member shall become an Economic Interest Owner.

- 23 -

14.3.    <u>Effect of Dissolution</u>.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Georgia Act.  Upon dissolution, the Board of Managers shall file a statement of commencement of winding up and publish the notice permitted by the Georgia Act.

14.4.    <u>Winding Up, Liquidation and Distribution of Assets.</u>

(a)    Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.  The Manager(s), or if none, the Persons selected by Majority Vote of the Members (the "Liquidators") shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Liquidators shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidators may determine to distribute any assets to the Members in kind);

(ii)    Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article X hereof;

(iii)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent or liabilities of the Company;

(iv)    Distribute the remaining assets to the Members, either in cash or in kind, in accordance with Section 9.1; and

(v)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by agreement of all of the Members.  Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement.

(c)    Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital Account.

(d)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

14.5.    <u>Certificate of Termination</u>.  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets have been distributed to the Members, a certificate evidencing such termination may be executed and filed with the Secretary of State of Georgia in accordance with the Georgia Act.

14.6.    <u>Return of Contribution Nonrecourse to Other Members</u>.  Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Account.  If the Company assets remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Account of one or more Members, including, without limitation, all or any part of that Capital Account attributable to Capital Contributions, then such Member or Members shall have no recourse against any other Member.

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

15.1.    <u>Application of Georgia Law</u>.  This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the Georgia Act.

15.2.    <u>No Action for Partition</u>.  No Member has any right to maintain any action for partition with respect to the assets of the Company.

15.3.    <u>Execution of Additional Instruments</u>.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

15.4.    <u>Construction</u>.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

15.5.    <u>Headings</u>.    The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

15.6.    <u>Waivers</u>.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

15.7.    <u>Rights and Remedies Cumulative</u>.    The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall

not preclude or waive the right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

15.8.  Exhibits.  All exhibits referred to in this Operating Agreement and attached hereto are incorporated herein by this reference.

15.9.  Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

15.10.  Creditors.  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company or by any Person not a party hereto.

15.11.  Counterparts.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

15.12.  Federal Income Tax Elections; Tax Matters Member.  For all purposes permitted or required by the Code, the Board of Managers shall constitute and appoint a Member as Tax Matters Member.  The initial Tax Matters Member shall be Joe Kolshak.  Except as set forth in this Operating Agreement, all elections required or permitted to be made by the Company under the Code shall be made by the Tax Matters Member.  The provisions on limitations of liability of the Managers and Members and indemnification set forth in Article V hereof shall be fully applicable to the Tax Matters Member in his or her capacity as such. The Tax Matters Member may resign at any time by giving written notice to the Managers. The Tax Matters Member may be removed at any time by action the Board of Managers by a Majority Vote by giving written notice to the Tax Matters Member. Upon removal or resignation, or if such Member is no longer a Member, then such other Member as shall be appointed by the Board of Managers shall serve as Tax Matters Member.  The Board of Managers may cause the Company to elect to be taxed as C Corporation effective upon the first day of any calendar year.  The Board of Managers may elect to be taxed as a C Corporation by filing Form 8832 with the Internal Revenue Service or by filing a certificate of conversion with the Secretary of State of Georgia.  If a certificate of conversion is filed with the Secretary of State of Georgia, then (i) articles of incorporation and bylaws will be adopted (such articles of incorporation and bylaws shall be as consistent as possible with this Operating Agreement); (ii) this Operating Agreement will be converted into a shareholders' agreement (such shareholders' agreement shall be as consistent as possible with this Operating Agreement and each Member hereby constitutes and appoints the corporation formed upon the filing of such certificate of conversion, with full power of substitution, as such Member's attorney-in-fact for the purposes of executing such shareholders' agreement, which appointment is coupled with an interest and is irrevocable); and (iii) and the Managers serving at the time of such conversion shall become the initial directors.

15.13.  Notices.  Any and all notices, offers, demands or election's required or permitted to be made under this Operating Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand-delivered (either in

person by the party giving such notice, or by its designated agent, or by commercial courier) or (ii) on the third (3rd) business day (which term means a day when the United States Postal Service, or its legal successor ("Postal Service") is making regular deliveries of mail on all of its regularly appointed week-day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage pre-paid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth on Exhibit A, or at such other address as the other party may hereafter designate by Notice.

15.14.  Certification of Non-Foreign Status.  In order to comply with § 1445 of the Code and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each Member shall provide to the Company an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Treasury Regulations. Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Board of Managers to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

15.15.  Amendments.  Except as set forth in this Section 15.15, any amendment to this Operating Agreement shall be made in writing and shall be effective upon a Supermajority Vote of the Members.  The Board of Managers may amend this Operating Agreement (i) to reflect transfers of Interests and admissions of new Members in accordance with the Operating Agreement; (ii) to make ministerial amendments to change an address or to comply with a law or regulation and to amendments required to; (iii) to amend the tax provisions of the Operating Agreement if the Company is taxed as a C Corporation pursuant to Section 15.12 (including eliminating the Tax Distribution for years that the Company is taxed as a C Corporation); and (iv) to make any other amendments to the Operating Agreement that do not materially impact the Members. Notwithstanding anything to the contrary in the Operaring Agreement, any amendment to this Operating Agreement that (i) requires Capital Contributions required to be made by any Member or that would require any Member to make a loan to the Company, (ii) modifies any provision governing the allocation of distributions or profits and losses (other than the issuance of additional units in accordance with the terms of this Agreement and other than amendments if the Company elects to be taxed as a C Corporation), (iii) imposes additional obligations on any Member, or (iv) otherwise adversely affecting the rights, privileges, preferences or obgligations of the Members under this Operating Agreement shall require a Supermajority Vote of the Members.

15.16.  Invalidity.  The invalidity or unenforceability of any particular provision of this Operating Agreement shall not affect the other provisions hereof, and the Operating Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.  If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, the provisions of this Operating Agreement shall control to the fullest extent permitted by applicable law.  Any provision found to be invalid or unenforceable shall not affect or invalidate the other provisions hereof, and this Operating Agreement shall be construed in all respects as if such conflicting provision were omitted.

15.17.  <u>Arbitration</u>.  Any dispute, controversy or claim arising out of or in connection with, or relating to, this Operating Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the City of Atlanta, State of Georgia, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any time or at any other place or under any other form of arbitration mutually acceptable to the parties so involved).  Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.  The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of a party's counsel if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic.

15.18.  <u>Further Assurances</u>.  The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Operating Agreement.

15.19.  <u>No Partnership Intended for Non-Tax Purposes</u>.  The Members have formed the Company under the Georgia Act, and expressly disavow any intention to form a partnership under Georgia's Uniform Partnership Act, Georgia's Uniform Limited Partnership Act or the partnership act or laws of any other state.  The Members do not intend to be partners one to another or partners as to any third party.  To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation. Defined terms herein containing the words "Partner" or "Partnership" as the terms are defined in such manner in the Treasury Regulations promulgated by the Internal Revenue Service shall refer to "Member" and "Company," respectively.

15.20.  <u>Relationship of this Agreement to the Default Rules</u>.  Regardless of whether this Operating Agreement specifically refers to a particular Default Rule, in no event shall any Default Rule apply to the Company, it being the interest of the Members that, by virtue of this Section 15.20, all of the Default Rules shall be negated and, to the fullest extent possible, all of the rights and obligations of the Members with respect to the Company shall be as set forth in this Operating Agreement and shall not arise from any provisions of the Act that constitute a Default Rule that is permitted to be made inapplicable, or modified with respect to, a limited liability company pursuant to the articles of organization or operating agreement of a limited liability company.   As used herein the term "Default Rule" means a rule or provision in the Act which (i) structures, defines, or regulates the finances, governance, operations or other aspects of a limited liability company organized under the Georgia Act; and (ii) applies except to the extent it is negated or modified through the provisions of a limited liability company's articles of organization or operating agreement.  By way of example and not limitation, Default Rules include (A) the provisions of Section 14-11-307 of the Georgia Act, concerning conflicting interest transactions; (B) the provisions of Section 14-11-308 of the Georgia Act, concerning approval rights of Members; (C)

the provisions of Section 14-11-407(a)(2) of the Georgia Act, concerning certain limitations on distributions where there are preferential rights to distributions upon liquidation; (D) the provisions of Section 14-11-1102 of the Georgia Act, concerning dissenters' rights; and (E) the provisions of Section 14-11-903(a) of the Georgia Act, concerning the consent of the Members to merge the Company with another entity.

15.21. <u>Time</u>.  TIME IS OF THE ESSENCE OF THIS OPERATING AGREEMENT, AND TO ANY PAYMENTS, ALLOCATIONS AND DISTRIBUTIONS PROVIDED FOR UNDER THIS OPERATING AGREEMENT.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have set their hands and seals as of the date first above written.

**MEMBERS**:

See attached signature page(s).

**MANAGERS**:

_____(SEAL)         _____(SEAL)

_____(SEAL)         _____(SEAL)

_____(SEAL)         _____(SEAL)

_____(SEAL)

K:\9178\1\PLAN DOX-FINAL\Exhbits\Operating Agreement_Holdco (09.10.15).docx

## EXHIBIT A

### MEMBERS

| Name | Name and Address | Initial Capital Contributions of Note(s) in the following Principal Amounts | Ownership Percentage | Units | Email |
|---|---|---|---|---|---|
| | | | | | |
| Thomas Norwood | Thomas W. Norwood 1190 Crest Valley Dr Atlanta GA 30327 | $2,320,000.00 | 12.1928% | 2,320,000.00 | tbirdwood@gmail.com |
| Roger C Tutterow | Roger C Tutterow 502 Vinings Crest Smyrna GA 30080 | $2,052,791.52 | 10.7884% | 2,052,791.52 | rtuttero@kennesaw.edu |
| Merrill Lynch | Merrill Lynch Attn: Vicki Lloyd 150 N. College St. Suite 2800 Charlotte NC 28255 | $761,841.52 | 4.0039% | 761,841.52 | |
| Barclay & Lorita Resler | Barclay & Lorita Resler 7721 Crossover Drive Mc Lean VA 22102 | $700,000.00 | 3.6788% | 700,000.00 | btresler@gmail.com |
| Lawson K Broadrick | Lawson K Broadrick 300 Landfall Rd. NW Atlanta GA 30328 | $627,684.89 | 3.2988% | 627,684.89 | lbroad@comcast.net |
| Alison M Drummond | Alison M Drummond 3452 Greystone Ct | $609,900.00 | 3.2053% | 609,900.00 | adrummond@strategicalt.com |
| Edw. C Mitchell IRA acct. 929992560 | TD AMERITRADE, Inc. 4075 Sorrento Valley Blvd. San Diego CA 92121 | $550,000.00 | 2.8905% | 550,000.00 | mitchec@bellsouth.net |
| Polestar Capital, LLC | Polestar Capital, LLC David Homrich - AMB Foundation 3223 Howell Mill Rd, NW Atlanta GA 30327 | $500,000.00 | 2.6277% | 500,000.00 | dhomrich@ambfo.com |
| John Whitmore | John Whitmore 209 S. Stephanie St. STE B-169 Henderson NV 89012 | $480,000.00 | 2.5226% | 480,000.00 | jgw2cpa@yahoo.com |
| Daniel J. Homrich | Mr. Daniel J. Homrich 1947 Carrington Ct. Stone Mountain GA 30087-1447 | $410,000.00 | 2.1548% | 410,000.00 | dan@thehomrichs.com |
| Gary L Beck (Lincoln Trust) | Lincoln Trust P.O. Box 5831 Denver CO 80217 | $390,000.00 | 2.0496% | 390,000.00 | |
| Michael Brumit | Michael Brumit 1090 Waterbury Close Powder Springs GA 30127 | $366,000.00 | 1.9235% | 366,000.00 | |
| Steve Kramer (IRA) | TD Ameritrade 4075 Sorrento Valley Blvd San Diego CA 92121 | $352,000.00 | 1.8499% | 352,000.00 | steve.kramer@aon.com |
| Diane M Ashkouti | Diane M Ashkouti 50 Old Stratton Chase Atlanta GA 30328 | $350,000.00 | 1.8394% | 350,000.00 | |
| Lester Sheppard | Lester Sheppard 1081 Flemings Knoll Greensboro GA 30642 | $350,000.00 | 1.8394% | 350,000.00 | |
| Samuel Calvin | Samuel Calvin Rogers | $335,000.00 | 1.7606% | 335,000.00 | sregorlac76@att.net |

| | | | | | |
|---|---|---|---|---|---|
| Rogers | 4396 Paces Point Circle Smyrna GA 30080 | | | | |
| Annette Reed | Annette Reed 3921 Glenhurst Dr, SE Smyrna GA 30080-5897 | $300,000.00 | 1.5766% | 300,000.00 | annereed@annereed.net |
| Linda Norwood | Linda Norwood 1190 Crest Valley Dr Atlanta GA 30327 | $286,256.22 | 1.5044% | 286,256.22 | |
| Fred C Follmer | Fred C Follmer 800 Jett Ferry Manor Atlanta GA 30350 | $280,000.00 | 1.4715% | 280,000.00 | |
| Tabas II LLP | Tabas II LLP Century Springs West 6000 Lake Forrest Dr. Ste 400 Atlanta GA 30328 | $275,000.00 | 1.4453% | 275,000.00 | jashkouti@fgmc.com |
| Gary Pheasant | Gary Pheasant 1099 Lanier Blvd Atlanta GA 30306 | $264,987.15 | 1.3926% | 264,987.15 | |
| Albert M. Pearson | Albert M. Pearson 3849 West Nancy Creek Place Atlanta GA 30319 | $250,000.00 | 1.3139% | 250,000.00 | amp1859law@gmail.com |
| Marsha M. Crowder | Marsha M. Crowder 325 McDaniel Rd Marietta GA 30064 | $250,000.00 | 1.3139% | 250,000.00 | charliecrowder1@hotmail.com |
| Bonita Tew | Bonita Tew 16314 E Dakota Rd Claremore OK 74017 | $245,000.00 | 1.2876% | 245,000.00 | bonnie.tew@gmail.com |
| Glenda F McCormick-Lewis | Glenda F McCormick-Lewis 1 Old Paces Place Atlanta GA 30327 | $230,000.00 | 1.2088% | 230,000.00 | |
| Royal Waffle King Corp | Royal Waffle King Corp 1459 Field Park Circle Marietta GA 30066 | $226,144.62 | 1.1885% | 226,144.62 | charliecrowder1@hotmail.com |
| Michael J Goldman | Michael J Goldman 1094 Lanier Blvd Atlanta GA 30306 | $213,295.53 | 1.1210% | 213,295.53 | |
| Edward P. Clancy | Edward & Sara Clancy 749 Camp Woods Rd Villanova PA 19085-1004 | $205,424.66 | 1.0796% | 205,424.66 | edsalclan@netscape.net |
| Jeanette Ramming | Jeanette Ramming 1 Lewis St. Hillsborough NJ 08844 | $200,000.00 | 1.0511% | 200,000.00 | Jan.Ramming@hlag.com |
| Rachel Hammer | Rachel Hammer 3508 Meeting House Mtn. Rd. Clayton GA 30525 | $200,000.00 | 1.0511% | 200,000.00 | |
| Kendall Summerhawk | NTC & Co fbo Kendall Summerhawk P.O. Box 173859 Denver CO 80217-5831 | $186,000.00 | 0.9775% | 186,000.00 | kendall@kendallsummerhawk.com |
| Robert Norwood | Robert Norwood 834 Kipling Dr. Atlanta GA 30318 | $170,000.00 | 0.8934% | 170,000.00 | |
| Charlie N Crowder | Charlie N Crowder 1459 Field Park Cir Marietta GA 30066 | $150,000.00 | 0.7883% | 150,000.00 | charliecrowder1@hotmail.com |
| Joseph Kolshak | Joseph Kolshak 19591 Vintage Trace Cir Fort Myers FL 33967 | $150,000.00 | 0.7883% | 150,000.00 | |
| Catherine Nort | Catherine Nort 2178 LeBaron Dr. Atlanta GA 30345 | $134,300.00 | 0.7058% | 134,300.00 | cnmhhi@gmail.com |
| Rebecca Fredericks | Rebecca Fredericks P.O. Box 1325 Alpharetta GA 30009-1325 | $132,500.00 | 0.6964% | 132,500.00 | rfredericks1@aol.com |

| | | | | |
|---|---|---|---|---|
| Mary Grace Miller | Mary Grace Miller<br>3872 Chaucer Wood<br>Atlanta GA 30319-1672 | $130,000.00 | 0.6832% | 130,000.00 | |
| Top Rows LLC | Top Rows LLC<br>2870 Peachtree Rd<br>Box 998<br>Atlanta GA 30305 | $120,000.00 | 0.6307% | 120,000.00 | |
| Mike Jennings | Mike Jennings<br>9810 Ottobahn<br>Amarillo TX 79119 | $120,000.00 | 0.6307% | 120,000.00 | |
| Mrs. John Tutterow | Mrs. John Tutterow<br>177 N. Highland #1114<br>Memphis TN 38111 | $112,000.00 | 0.5886% | 112,000.00 | tutterow_rc@kennesaw.edu |
| Estate of Kenneth F. Magina | Bonita Tew<br>16314 E Dakota Rd<br>Claremore OK 74017 | $110,000.00 | 0.5781% | 110,000.00 | bonnie.tew@gmail.com |
| C Paul Jolly | C Paul Jolly<br>4431 Davidson Ave<br>Atlanta GA 30319 | $100,000.00 | 0.5255% | 100,000.00 | |
| Corners Court, LLC | Century Springs West<br>6000 Lake Forrest Dr.<br>Ste 400<br>Atlanta GA 30328 | $100,000.00 | 0.5255% | 100,000.00 | jashkouti@fgmc.com |
| Donald W. Paul | Donald W. Paul<br>3770 Harbour Landing Drive<br>Gainesville GA 30506 | $100,000.00 | 0.5255% | 100,000.00 | |
| Gary L Beck | Gary L Beck<br>2033 2nd Ave, Apt 1910<br>Seattle WA 98121 | $100,000.00 | 0.5255% | 100,000.00 | |
| James E Vann | James E Vann<br>1354 Murrays Loch Place<br>Kennesaw GA 30152 | $100,000.00 | 0.5255% | 100,000.00 | |
| James K Cheney | James K Cheney<br>200 River Bottom Rd<br>Athens GA 30606 | $100,000.00 | 0.5255% | 100,000.00 | |
| Keagan R. Lenihan | Keagan R. Lenihan<br>3627 Trinity Drive<br>Alexandria VA 22304 | $100,000.00 | 0.5255% | 100,000.00 | |
| Peter MacGregor | Peter MacGregor<br>904 Steam Valley Trl.<br>Alpharetta GA 30022 | $100,000.00 | 0.5255% | 100,000.00 | pmacgregor5@gmail.com |
| Shops @ South Cobb, LLC | Shops @ South Cobb, LLC<br>Century Springs West<br>6000 Lake Forrest Dr.<br>Ste 400<br>Atlanta GA 30328 | $100,000.00 | 0.5255% | 100,000.00 | jashkouti@fgmc.com |
| Pierce Resler Coffee | Pierce Resler Coffee<br>805 Cresent Dr<br>Alexandria VA 22302 | $97,500.00 | 0.5124% | 97,500.00 | |
| Janet Ashkouti | Century Springs West<br>6000 Lake Forrest Dr.<br>Ste 400<br>Atlanta GA 30328 | $80,000.00 | 0.4204% | 80,000.00 | |
| Herbert or Rose Marie Paul | Herbert or Rose Marie Paul<br>6821 Huntingridge Rd<br>Chapel Hill NC 27517 | $75,000.00 | 0.3942% | 75,000.00 | |
| Sutton Resler | Sutton Resler<br>7721 Crossover Drive<br>Mc Lean VA 22102 | $75,000.00 | 0.3942% | 75,000.00 | |
| Mark Homrich | Charles Schwab & Co., Inc.<br>Orlando Operations Center<br>P.O. Box 628291<br>Orlando FL 32862-8291 | $70,000.00 | 0.3679% | 70,000.00 | homrich@bellsouth.net |
| Sandra Gould | Sandra Gould | $60,827.38 | 0.3197% | 60,827.38 | |

| | | | | |
|---|---|---|---|---|
| | 88 Poor Farm Rd<br>Lyman ME 04002 | | | | |
| Mary E Carlson | Mary E Carlson<br>335 Hammond Dr.<br>Unit 618<br>Atlanta GA 30328 | $60,000.00 | 0.3153% | 60,000.00 | |
| Marilyn Pheasant | Marilyn Pheasant<br>21 Madison Ave.<br>Rochester NH 03867 | $57,247.48 | 0.3009% | 57,247.48 | |
| Jack F. Crowder (IRA) | TD Ameritrade<br>4075 Sorrento Valley Blv<br>San Diego CA 92121 | $55,000.00 | 0.2891% | 55,000.00 | |
| Dawn Connell | Dawn Connell<br>10108 Buggy Horse Rd<br>Charlotte NC 28277 | $52,500.00 | 0.2759% | 52,500.00 | dtconl@bellsouth.net |
| Linda Haley Blumberg | c/o Drew Blumberg<br>ADB Services Inc<br>8215 Roswell Rd.<br>Bldg 1100<br>Atlanta GA 30350 | $50,000.00 | 0.2628% | 50,000.00 | |
| Ellis A Mansour | Ellis A Mansour<br>7 Mission Dr<br>Newnan GA 30263 | $50,000.00 | 0.2628% | 50,000.00 | |
| Land Associates, Inc. | Land Associates, Inc.<br>200 River Bottom Rd.<br>Athens GA 30606 | $50,000.00 | 0.2628% | 50,000.00 | |
| Patric Jordan | Patric Jordan<br>445 Cameron Valley Ct<br>Atlanta GA 30328 | $50,000.00 | 0.2628% | 50,000.00 | |
| Richard Martin | Richard Martin<br>2460 Brookhaven Heights Ct<br>Atlanta GA 30319 | $50,000.00 | 0.2628% | 50,000.00 | |
| RJK Ventures LLLP | RJK Ventures LLLP<br>2130 Clay Dr.<br>Atlanta GA 30350 | $50,000.00 | 0.2628% | 50,000.00 | |
| Rob Caldwell | Robert Caldwell<br>4628 Robie Rd<br>Lilburn GA 30047 | $50,000.00 | 0.2628% | 50,000.00 | |
| Diane A Domit | Diane A Domit<br>5301 Ashley Trace<br>Atlanta GA 30360 | $46,666.67 | 0.2453% | 46,666.67 | |
| Charlene Shikany | Charlene Shikany<br>1715 N. Holly Ln<br>Atlanta GA 30329-3523 | $45,500.00 | 0.2391% | 45,500.00 | mshikany@mindspring.com |
| Lisa Barranco Murphy | Lisa Barranco Murphy<br>Mountain Lake<br>P.O. Box 832<br>Lake Wales FL 33859 | $45,000.00 | 0.2365% | 45,000.00 | |
| Michelle Mansour | Michelle Mansour<br>9 Mission Dr<br>Newnan GA 30263 | $45,000.00 | 0.2365% | 45,000.00 | |
| Paula Elliott | Dr. Paula Elliott<br>9460 Magnolia Crossing Dr<br>Greenwell Springs LA 70739 | $40,000.00 | 0.2102% | 40,000.00 | pje2005@gmail.com |
| Anna Kramer | Anna Kramer<br>2825 Northbrook Dr<br>Atlanta GA 30340 | $35,000.00 | 0.1839% | 35,000.00 | steve.kramer@aon.com |
| Michael Kramer | Michael Kramer<br>3646 Emerald St.<br>APT 131<br>Torrance CA 90503 | $35,000.00 | 0.1839% | 35,000.00 | |
| Diane & Mitchell Domit | Diane & Mitchell Domit<br>5301 Ashley Trace<br>Atlanta GA 30360 | $30,000.00 | 0.1577% | 30,000.00 | |
| Patric Jordan - IRA | TD Ameritrade<br>4075 Sorrento Valley Blvd | $30,000.00 | 0.1577% | 30,000.00 | |

| | | | | |
|---|---|---|---|---|
| | San Diego CA 92121 | | | | |
| Charlie Shikany | Charlie Shikany<br>1400 F Church St<br>Decatur GA 30030 | $29,351.97 | 0.1543% | 29,351.97 | mshikany@mindspring.com |
| LaRue S Sellars | Larue S Sellars<br>2308 Huntingdon Chase<br>Dunwoody GA 30350 | $28,000.00 | 0.1472% | 28,000.00 | |
| Sara P. Reed | Sara P. Reed<br>1285 Lanier Pl., NE<br>Atlanta GA 30306 | $27,054.13 | 0.1422% | 27,054.13 | |
| A Trent<br>Germano | A Trent Germano<br>PO Box 420648<br>Atlanta GA 30342-0648 | $25,000.00 | 0.1314% | 25,000.00 | trent@atgermano.com |
| Dean Fowler | Dean Fowler<br>8385 Sentinae Chase Dr<br>Roswell GA 30076 | $25,000.00 | 0.1314% | 25,000.00 | |
| Frank or<br>Margaret Wilder | Frank or Margaret Wilder<br>3434 Rhett Butler<br>Hernando MS 38632 | $25,000.00 | 0.1314% | 25,000.00 | smwilder@yahoo.com |
| Keith Caldwell | Keith Caldwell<br>1723 Sweet Branch Trl<br>Grayson GA 30017 | $25,000.00 | 0.1314% | 25,000.00 | |
| Michael or<br>Ramona Sauter | Michael or Ramona<br>Sauter<br>3329 Collier Pt<br>Atlanta GA 30019 | $25,000.00 | 0.1314% | 25,000.00 | |
| Ned T Murphy | Ned T Murphy<br>Mountain Lake<br>P.O. Box 832<br>Lake Wales FL 33859 | $25,000.00 | 0.1314% | 25,000.00 | |
| Ramona J<br>Sauter | Ramona J Sauter<br>3329 Collier Pt<br>Atlanta GA 30019 | $25,000.00 | 0.1314% | 25,000.00 | |
| Rob Vaka | Rob Vaka<br>140 Stone Pond Lane<br>Alpharetta  GA 30022 | $25,000.00 | 0.1314% | 25,000.00 | |
| Robert E<br>Flanagan Sr | Robert E Flanagan Sr<br>15 Mansour Dr<br>Newnan GA 30263 | $25,000.00 | 0.1314% | 25,000.00 | |
| Robert Huttman | Robert Huttman<br>1252 Hampton Hall Dr<br>Atlanta GA 30319 | $25,000.00 | 0.1314% | 25,000.00 | |
| Steve Wilder | Steve Wilder<br>3862 Montford Drive<br>Chamblee GA 30341 | $25,000.00 | 0.1314% | 25,000.00 | |
| Kathleen<br>McFadden (IRA<br>Acct) | TD Ameritrade<br>4075 Sorrento Valley Blvd<br>San Diego CA 92121 | $25,000.00 | 0.1314% | 25,000.00 | |
| Merrell F Adams<br>(IRA Acct) | TD Ameritrade<br>4075 Sorrento Valley Blvd<br>San Diego CA 92121 | $25,000.00 | 0.1314% | 25,000.00 | |
| William D.<br>Walsh | William D. Walsh<br>4920 Hadaway Rd<br>Kennesaw GA 30152 | $24,354.12 | 0.1280% | 24,354.12 | |
| Ted Crowder | Ted Crowder<br>1045 Grimes Bridge Rd.<br>Roswell GA 30075 | $24,225.22 | 0.1273% | 24,225.22 | ted@atlantadj.com |
| Katherine<br>Pheasant | Katherine Pheasant<br>1099 Lanier Blvd<br>Atlanta GA 30306 | $21,813.03 | 0.1146% | 21,813.03 | |
| Brandon<br>Ashkouti | Century Springs West<br>6000 Lake Forrest Dr.<br>Ste 400<br>Atlanta GA 30328 | $20,000.00 | 0.1051% | 20,000.00 | brandon@alpinesouth.net |
| Barclay T Resler<br>III | Barclay T Resler III<br>7775 Walton Parkway<br>New Albany OH 43054 | $17,500.00 | 0.0920% | 17,500.00 | barclayresler@yahoo.com |
| Charlie Shikany-<br>custodial | Michael Shikany,<br>Custodian | $16,500.00 | 0.0867% | 16,500.00m | mshikany@mindspring.com |

| | | | | |
|---|---|---|---|---|
| | 1715 N Holly Ln.<br>Atlanta GA 30329-3523 | | | | |
| Kelli & Kevin Sullivan | Century Springs West<br>6000 Lake Forrest Dr.<br>Ste 400<br>Atlanta GA 30328 | $15,000.00 | 0.0788% | 15,000.00 | |
| Darius Soodmand | Darius Soodmand<br>1765 Mayfield Rd<br>Alpharetta GA 30009 | $15,000.00 | 0.0788% | 15,000.00 | darius@alpinesouth.net |
| Interactive Insurance Solutions, Inc. | Interactive Insurance<br>Solutions, Inc.<br>C/O Mr. John Todd<br>729 Ragsdale Rd.<br>Sharpsburg GA 30277 | $15,000.00 | 0.0788% | 15,000.00 | iisjtodd@charter.net |
| Michael Shikany | Michael Shikany<br>1715 N Holly Ln<br>Atlanta GA 30329 | $15,000.00 | 0.0788% | 15,000.00 | mshikany@mindspring.com |
| Skylar E Sullivan | Century Springs West<br>6000 Lake Forrest Dr.<br>Ste 400<br>Atlanta GA 30328 | $12,000.00 | 0.0631% | 12,000.00 | |
| John Todd | Mr. John Todd<br>729 Ragsdale Rd<br>Sharpsburg GA 30277 | $12,000.00 | 0.0631% | 12,000.00 | iisjtodd@charter.net |
| Gracyn Sullivan | Century Springs West<br>6000 Lake Forrest Dr.<br>Ste 400<br>Atlanta GA 30328 | $10,000.00 | 0.0526% | 10,000.00 | |
| Christa Shikany | Christa Shikany<br>1914 Timothy Dr NE<br>Atlanta GA 30329 | $10,000.00 | 0.0526% | 10,000.00 | mshikany@mindspring.com |
| Andrew C Norwood | Andrew C Norwood<br>510 S Washington St<br>Denver CO 80209 | $8,523.54 | 0.0448% | 8,523.54 | norwooda@gmail.com |

<u>EXHIBIT B</u>

MANAGERS

| Managers<br>Name and Address |
| --- |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

**EXHIBIT B-3**
**OPERATING AGREEMENT OF FACTEON ASSET RECOVERY, LLC**

# OPERATING AGREEMENT OF
# FACTEON ASSET RECOVERY, LLC

**THIS OPERATING AGREEMENT**, dated as of _____, 2015 (the "Effective Date") is adopted, executed, and agreed to, for good and valuable consideration, by the Member (as defined below).

# ARTICLE I
# DEFINITIONS

1.01    Definitions.    The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

"Articles of Organization" means the Articles of Organization of Facteon Asset Recovery, LLC, as filed with the Secretary of State of Georgia as the same may be amended from time to time.

"Capital Account" means, with respect to the Member, the Capital Account maintained in accordance with the provisions of this Operating Agreement relating to the maintenance of Capital Accounts and the provisions of Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. The Member also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Operating Agreement not to comply with Regulations Section 1.704-1(b).

"Capital Contribution" means any contribution, as defined in O.C.G.A. §14-11-101(4), to the capital of the Company in cash or property by the Member whenever made.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means Facteon Asset Recovery, LLC.

"Georgia Act." The Georgia Limited Liability Company Act at O.C.G.A. §14-11-100, et seq.

"Member" shall refer to Facteon Holdings LLC, the sole member of the Company.

"Membership Interest." A Member's entire interest in the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Member granted pursuant to this Operating Agreement or the Georgia Act.

"Operating Agreement." This Operating Agreement as originally executed and as amended from time to time.

"Person." Any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves."  With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Member for working capital and to pay taxes, insurance, debt service or other costs or expenses incident of the ownership or operation of the Company's business.

"Treasury Regulations" or "Regulations".  The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**ARTICLE II**
**FORMATION OF COMPANY**

2.01  Formation.  The Company was formed by its organizer as a Georgia Limited Liability Company by executing and delivering articles of organization to the Secretary of State of Georgia in accordance with the provisions of the Georgia Act.

2.02  Name.  The name of the Company is Facteon Asset Recovery, LLC.

2.03  Principal Place of Business.  The principal place of business of the Company within the State of Georgia is , 700 Galleria Parkway, Suite 440, Atlanta, Georgia, 30339.  The Company may locate its places of business and registered office at any other place or places as the Member may from time to time deem advisable.

2.04  Registered Office and Registered Agent.  The Company's initial registered office shall be at the office of its registered agent at 1100 Peachtree Street, Suite 800, Atlanta, Georgia, 30309.  The current registered agent is John A. Christy, Esq.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Georgia Act and the applicable rules promulgated thereunder.

2.05  Term.  The term of the Company shall commence on the date the Articles of Organization were filed with the Secretary of State of Georgia and shall continue thereafter in perpetuity unless earlier dissolved in accordance with the provisions of this Operating Agreement or the Georgia Act.

**ARTICLE III**
**BUSINESS OF COMPANY**

3.01  Permitted Businesses.  The business of the Company shall be:

(a)  To accomplish any lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets.

(b)  To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Georgia Act.

Page 2 of 8

   (c)  To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE IV
## NAMES AND ADDRESS OF MEMBER

  4.01 <u>Member's Name and Address</u>.  The name and address of the sole Member is as follows:

    Facteon Holdings LLC    700 Galleria Parkway,
                     Suite 440
                      Atlanta, Georgia  30339

## ARTICLE V
## RIGHTS AND DUTIES OF MEMBER

  5.01 <u>Management</u>.  The business and affairs of the Company shall be managed by the Member.  The Member shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, all in accordance with the terms hereof.

  5.02 <u>Liability for Certain Acts</u>.  The Member shall act in a manner it believes in good faith to be in the best interest of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  The Member is not liable to the Company for any action taken in managing the business or affairs of the Company if it performs the duty of his office in compliance with the standard contained in this Section.  The Member shall not be liable to the Company for any loss or damage sustained by the Company except loss or damage resulting from intentional misconduct or knowing violation of law or a transaction for which the Member received a personal benefit in violation or breach of the provisions of this Operating Agreement.  The Member shall be entitled to rely on information, opinions, reports or statements, including, but not limited to, financial statements or other financial data prepared or presented in accordance with the provisions of O.C.G.A. §14-11-305.

  5.03 <u>Member Has No Exclusive Duty to Company</u>.  The Member shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company.  The Member shall incur no liability to the Company as a result of engaging in any other business or venture.

  5.04 <u>Bank Accounts</u>.  The Member may from time to time open bank accounts in the name of the Company.

  5.05 <u>Indemnity of the Member</u>.  To the fullest extent permitted under O.C.G.A. §14-11-306, the Company shall indemnify the Member and make advances for expenses to him with respect to such matters to the maximum extent permitted under applicable law.

## ARTICLE VI
## LIABILITIES OF MEMBER

6.01    <u>Limitation on Liability</u>.  The Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

6.02    <u>No Liability for Company Obligations</u>.  The Member will not have any personal liability for any debts or losses of the Company beyond his Contributions, except as provided by law.

6.03    <u>Loans to Company</u>.  Nothing in this Operating Agreement shall prevent the Member from making secured or unsecured loans to the Company by agreement with the Company on such terms as may be approved by the Member.

## ARTICLE VII
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

The Member may make Capital Contributions to the Company at such times and in such as the Member may determine.

## ARTICLE VIII
## DISTRIBUTIONS

8.01    <u>Distributions.</u>   All distributions shall be made at such times and in such amounts as the Member may determine.

8.02    <u>Limitation Upon Distributions.</u>   No distribution shall be made to the Member if prohibited by O.C.G.A.§ 14-11-407.

## ARTICLE IX
## BOOKS AND RECORDS

9.01    <u>Accounting Period.</u>  The Company's accounting period shall be the calendar year.

9.02    <u>Records.</u>  At the expense of the Company, the Member shall maintain records and accounts of all operations and expenditures of the Company and those records required by the Georgia Act.  The Company shall keep such records at its principal place of business.

9.03    <u>Fiscal Year</u>.  The Company's fiscal year, which shall be the calendar year.

9.04    <u>Tax Returns.</u>  At the expense of the Company, the Member shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.

## ARTICLE X

**TRANSFERABILITY**

10.01   <u>Transferability</u>.  The Member shall have the right to:

(a)      sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

(b)      gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law),

all or part of its Membership Interest.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.01   <u>Dissolution.</u>      The Company shall be dissolved upon the occurrence of any of the following events:

(i)      the decision of the Member; or

(ii)      by the withdrawal, removal, bankruptcy, insolvency, death or incompetency of the Member, the sale or redemption of the Member's entire Membership Interest, or the occurrence of any other event which terminates the continued membership of the Member in the Company pursuant to O.C.G.A. §14-11-601 or any other provision of the Georgia Act (a "Withdrawal Event"), unless within 90 days after the Withdrawal Event the personal representative of the Member agrees in writing to continue the Company and to admit itself or some other Person as a member of the Company effective as of the date of the occurrence of the event that terminated the continued membership of the Member.

11.02   <u>Effect of Dissolution</u>.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by O.C.G.A. §14-11-605. Upon dissolution, the Member shall file a statement of commencement of winding up pursuant of O.C.G.A. §14-11-606 and publish the notice permitted by O.C.G.A. §14-11-608.

11.03   <u>Winding Up, Liquidation and Distribution of Assets.</u>

(a)      Upon dissolution, the Member shall immediately proceed to wind up the affairs of the Company.

(b)      If the Company is dissolved and its affairs are to be wound up, the Member shall:

(i)      Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Member may determine to distribute any assets to the Members in kind, if any),

   (ii) Discharge all liabilities of the Company, including liabilities to the Member as a creditor, to the extent otherwise permitted by law, and establish such Reserves as may be reasonably necessary to provide for contingent or other liabilities of the Company,

   (iii) Distribute the remaining assets to the Member.

   (c) Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

   (d) The Member shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

  11.04 <u>Certificate of Termination</u>. When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Member, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A. §14-11-610.

**ARTICLE XII**
**<u>MISCELLANEOUS PROVISIONS</u>**

  12.01 <u>Application of Georgia Law</u>. This Operating Agreement and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Georgia Act.

  12.02 <u>Construction</u>. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

  12.03 <u>Headings</u>. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

  12.04 <u>Waivers</u>. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

  12.05 <u>Severability</u>. If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

  12.06 <u>Heirs, Successors and Assigns</u>. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

12.07   <u>Creditors</u>.  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

12.08   <u>Federal Income Tax Elections</u>.  All elections required or permitted to be made by the Company under the Code shall be made by the Member as determined in its sole discretion. For all purposes permitted or required by the Code, the Member shall act as the Tax Matters Partner.

12.09   <u>Amendments</u>.  Any amendment to this Operating Agreement shall be made in writing and signed by the Member.

12.10   <u>Time</u>.  TIME IS OF THE ESSENCE OF THIS AGREEMENT, AND TO ANY PAYMENTS, ALLOCATIONS AND DISTRIBUTIONS SPECIFIED UNDER THIS AGREEMENT.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** this Agreement has been signed, sealed and delivered as of this _____ day of _____, 2015.

<u>**MEMBER**</u>**:**


FACTEON HOLDINGS LLC


By:_____(SEAL)
Name:_____
Title:_____

K:\9178\1\PLAN DOX-FINAL\Exhbits\operating agreement (Facteon Asset Recovery LLC).doc

**EXHIBIT B-4**
**AMENDED AND RESTATED OPERATING AGREEMENT OF COMPLY FIRST, LLC**

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**COMPLY FIRST, LLC**
**a Georgia Limited Liability Company**

W I T N E S S E T H :

**WHEREAS,** Facteon, LLC,  a Georgia limited liability company (the "Original Member") entered into an Operating Agreement for the Company dated as of August 14, 2014 (the "Original Agreement"); and

**WHEREAS,**  Steven Howell ("Howell") and Patrick Delaney ("Delaney") have been granted membership interests in the Company for services; and

**WHEREAS**, Noel Capon and Paul Capon have acquired a membership interests from the Company in exchange for a capital contributions;

**WHEREAS,**  the Original Member transferred its membership interest in the Company to Facteon Holdings LLC, a Georgia limited liability company, ("Holdings") as of _____, 2015; and

**WHEREAS,** the parties do hereby agree to amend and restate the Original Agreement as follows:

**ARTICLE I**
**DEFINITIONS**

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:  (i) credit to such Capital Account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the next to last sentences of Sections 1.704-(2)(g)(1) and 1.704-2(i)(5) of the Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" means (a) in the case of an individual, any relative of such Person, (b) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such Person; (c) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control

with such Person; or (d) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Agreed Value" the amount the selling Member or Economic Interest owner would receive under Section 10.03 or 10.44, as applicable,  with respect to the Units being sold if the Company made a liquidating distribution equal to the net book value of the Company on the Valuation Date.  The net book value of the Company as of the Valuation Date  shall be determined by the Company's accountant. Such accountant's determination of the net book value of the Company shall be binding on the parties hereto. In determining the net book value of the Company, the accountant making such determination shall use the method of accounting used by the Company for federal income tax purposes.

"Allocation Year" means (i) the period commencing on the date hereof and ending on December 31, 2015, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clauses (i) or (ii) for which the Company is required to allocate Net Profits, Net Losses, and other items of Company income, gain, loss, or deduction pursuant to Article IX hereof.

"Capital Account" means, with regards to a Member, a capital account established, maintained, and adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

"Capital Contribution" means any contribution to the capital of the Company in cash or property by a Member whenever made, and shall include the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the interest in the Company held by such Member.

"Cause" means, with respect to any Employee Member, the occurrence of any of the following after the date here:   (a) the Employee Members inattention to or substandard performance of the services required of the Employee Member by the Company or the Manager; (b) failure of the Employee Member to follow reasonable instructions of the Manager; (c) gross negligence or willful misconduct of the Employee Member while providing services to the Company; (d) falsifying Company records by a Member; (e) an Employee Member's violation of any Company policy;  (f) commission by an Employee Member of a crime involving breach of trust or moral turpitude or classified as a felony under applicable law; and (g) an Employee Member's breach of this Operating Agreement.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the New Jersey Department of the Treasury Division of Revenue and Enterprise Services as the same may be amended from time to time.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means Comply First, LLC.

"Company Minimum Gain" has the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Disability." A Member shall be treated as having incurred "Disability" upon the inability through physical or mental illness to perform his duties to the Company on a full time basis for a period of three (3) months.

"Economic Interest" means a Member's share of the Company's Profits, Losses and distributions of the Company's property pursuant to the Agreement and the New Jersey Act. A Member's Economic Interest shall not include any right to participate in the management of the business and affairs of the Company, including any rights to vote on, consent to or otherwise participate in any decision or action of the Members granted pursuant to this Operating Agreement or the Georgia Act.

"Employee Member" mean Howell, Delaney or any other employee of the Company granted a membership interest in exchange for services.

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization or any other entity.

"Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed by the contributing Member and the other Members;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by the Manager and, as of the following times: (a) the acquisition of an additional Interest in the Company (other than pursuant to the original purchase at the time of formation of the Company) by any new or existing Member in exchange for more than a *de minimis* Capital Contribution, (b) the distribution by the Company to a Member of more than a *de minimis* amount of Company property (other than cash) as consideration for an Interest in the Company; (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (d) in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a member capacity in anticipation of being a Member *provided, however,* that the adjustments pursuant to clauses (a), (b) and (d) above shall be

made only if such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company, as determined by the Manager with the approval of the Members;

(iii)     The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset (taking Code Section 7701(g) into account) on the date of distribution as agreed by the Members;

(iv)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustment to the tax basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustment: (A) is taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, and (B) does not duplicate any adjustment otherwise required by clause (ii) or (iii) of this definition of Gross Asset Value; and

(v)     If the Gross Asset Value of an asset has been determined or adjusted pursuant hereto, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Majority Interest"  Ownership Percentages of  the Members which, taken together, constitute a majority of all Ownership Percentages.

"Majority Vote"  In the case of Members, the vote or written consent of Members holding more than fifty percent (50%) of the Ownership Percentages held by all Members entitled to vote on or consent to the issue in question.  In the case of the Managers, the vote or written consent of Managers representing a majority of all Managers of the Company entitled to vote on or consent to the issue in question.

"Manager(s)" means one or more Managers designated pursuant to this Operating Agreement.  Specifically, Manager shall mean Holdings, or any other Person that succeeds such Person in its capacity as Manager.  At any time there is more than one Manager of the Company, all references to the Manager in the singular shall be deemed to refer to such Managers.

"Member" means each of the parties who execute a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members.  Unless specifically stated otherwise, all references to a Member shall include a Member acting as a Manager.

"Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Debt" has the meaning of "partner nonrecourse debt" set forth in Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Deductions" has the meaning of "partner nonrecourse deductions" set forth in Section 1.704-2(i)(2) of the Regulations.

"New Jersey Act" means the New Jersey Revised Limited Liability Company Act.

"Net Cash From Operations" means the gross cash proceeds from Company operations (including sales and dispositions of Property in the ordinary course of business) less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Manager.  "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of Reserves previously established.

"Net Cash From Sales or Refinancings" means the net cash proceeds received by the Company from all sales and other dispositions (other than in the ordinary course of business) and all refinancings of Property, less any portion thereof used to establish Reserves, all as determined by the Manager.

"Net Profits" and "Net Losses" means the Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years.

"Nonrecourse Deductions" has the meaning set forth in Sections 1.704-2(b)(1) and 1.704-2(c) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Operating Agreement" means this Amended and Restated Operating Agreement as originally executed and as amended from time to time.

"Ownership Interest" means a Member's ownership interest in the Company, including its share of the profits and losses of the Company and its right to receive distributions of Company Property and any and all rights, powers and benefits accorded to a Member under this Agreement and the duties and obligations of such Member hereunder.

"Ownership Percentage."  The proportion that a Member's Units bear to the aggregate Units owned by all Members from time to time.  The current Ownership Interests of the Members are as set forth on Exhibit A attached hereto and made a part hereof.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Property" means all that real and personal property acquired by the Company and any improvements thereto and shall include both tangible and intangible property.

""Proportionate Share." As used in this Operating Agreement, the term "Proportionate Share" shall mean the portion of the Offered Units (or other Units available for purchase hereunder) determined by multiplying the number of the Offered Units (or other Units available for purchase hereunder) by a fraction, the numerator of which is the number of Units owned by each Member who is entitled to and who elects to purchase his or her Proportionate Share of the Offered Units (or other Units available for purchase hereunder), and the denominator of which is the total number of Units owned by all of the Members who are entitled to and who elect to purchase their Proportionate Share of the Offered Units (or other Units available for purchase hereunder) pursuant to this Operating Agreement. For example, if only one of the other Members elects to purchase such Member's Proportionate Share of the Offered Units (or other Units available for purchase hereunder) pursuant to this Operating Agreement, then such other Member shall be entitled to, and shall be required to, purchase all of the Offered Units (or other Units available for purchase hereunder).

"Reserves" means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident of the ownership or operation of the Company's business.

"Transferring Member" means a Member who sells, assigns, pledges, hypothecates or otherwise transfers for consideration or gratuitously all or any portion of his Ownership Interest or Economic Interest.

"Treasury Regulations" or "Regulations" means the Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Valuation Date" shall mean the date of termination of a Member's employment with the Company or the date of completed or attempted sale, transfer, pledge, gift, encumbrance or other disposition of any Units in violation of the provisions of this Operating Agreement, as the case may be.

"Unit."   A denomination representing the Ownership Interest of the Members in the Company.

**ARTICLE II**
**FORMATION OF COMPANY**

2.01   Formation.  The Company was formed by its organizer as a New Jersey Limited Liability Company by executing and delivering the Certificate of Formation to to the New Jersey Department of the Treasury Division of Revenue and Enterprise Services in accordance with the provisions of the New Jersey Act.

2.02    <u>Name</u>.  The name of the Company is Comply First, LLC.

**ARTICLE III**
**BUSINESS OF COMPANY**

3.01    <u>Permitted Businesses</u>.  The business of the Company shall be (i) to accomplish any lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets; (ii) to exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the New Jersey Act and (iii) to engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

3.02    <u>Tax Characterization</u>.  The Members acknowledge that it is the intention of the Company to be treated as a "partnership" for federal and all relevant state tax purposes and the Company shall make all available elections to be so treated.

**ARTICLE IV**
**<u>NAMES AND ADDRESSES OF MEMBERS</u>**

The names and addresses of the Members are as listed on <u>Exhibit A</u>, attached hereto and incorporated herein by reference.

**ARTICLE V**
**<u>MANAGEMENT</u>**

5.01    <u>Management</u>. The business and affairs of the Company shall be managed by its Manager.  Except for situations where the approval of the Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

5.02    <u>Certain Powers of the Manager</u>.  Without limiting the generality of Section 5.01 and subject to Section 5.10 hereof, the Manager shall have the absolute power and authority on behalf of the Company:

(a)    To acquire any property outside of the ordinary course of business from any Person as the Manager may determine.  The fact that a Manager is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person.

(b)    To borrow money for the Company from banks, other lending institutions, the Members, or affiliates of the Members on such terms as the Manager deems appropriate.  No debt shall be contracted or liability incurred by or on behalf of the Company except by the

Manager, or to the extent permitted under the New Jersey Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager.

       (c)      To purchase liability and other insurance to protect the Company's property and business.

       (d)      To hold and own any Company real and/or personal properties in the name of the Company and sell or dispose of the Company's assets in the ordinary course of the Company's business.

       (e)      To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments.

       (f)      To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages, security deeds or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; deeds; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company.

       (g)      To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds.

       (h)      To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager may approve.

       (i)      To do and perform all other acts as may be necessary or appropriate of the conduct of the Company's business.

Unless authorized to do so by this Operating Agreement or by the Manager, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniary for any purpose.

5.03    <u>Manager Has No Exclusive Duty to Company</u>.  The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company. The Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

5.04    <u>Bank Accounts</u>.  The Manager may from time to time open bank accounts in the name of the Company, and the Manager shall be the sole signatory thereon, unless the Manager determines otherwise.  All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Manager.  All funds of the Company

shall be used solely for the business of the Company. All withdrawals from the Company bank accounts shall be made only upon checks signed by a Manager or by such other persons as the Manager may designate from time to time.

5.05    Term. The Manager shall serve at the discretion of the Members. Unless otherwise provided by a vote or written consent of a Majority Interest of the Members, such Manager's term (subject to removal at the discretion of the Members in accordance with Section 5.07) shall be for the remaining term of the Company.

5.06    Resignation. Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who also is a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.07    Removal. All or any lesser number of Managers may be removed at any time, with or without cause, by a vote or written consent of a Majority Interest of the Members. The removal of a Manager who also is a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.08    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the vote or written consent of a Majority Interest of the Members. A Manager elected to fill a vacancy shall hold office until the expiration of his term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal. If for any reason at any time there is not at least one Manager, then each Member shall automatically become a Manager until such time as the Members, by the vote or written consent of a Majority Interest of the Members, have designated one or more Managers.

5.09    Salaries. The salaries and other compensation (if any) of the Manager shall be fixed from time to time by the vote or written consent of a Majority Interest of the Members, and no Manager shall be prevented from receiving such salary by reason of the fact that he or she also is a Member of the Company.

5.10    Limitations on Manager's Authority. Notwithstanding anything to the contrary contained herein, no Manager shall have the power or authority to take any of the following actions without a Majority Vote of the Members.

(a)     Enter into any contracts or agreements with affiliated or related parties or pay monies to same or otherwise engage in self dealing;

(b)     Enter into contracts which would commit or obligate the Company to expend more than $50,000.00 of Company funds;

(c)     File bankruptcy for the Company, settle or compromise any claim of the Company in excess of $50,000.00, or confess a judgment against the Company;

(d)     Make any loans of Company funds;

(e)     Cause the Company to be a party to a merger; or

(f)     Obtain any loan for the Company or secure any loan by Company assets.

5.11   <u>Indemnity of the Manager</u>.  To the fullest extent permitted under the New Jersey Act, the Company shall indemnify the Managers and make advances for expenses to it with respect to its duties (including fiduciary duties) and liabilities arising out of or connected with its capacities as Manager.

## ARTICLE VI
## RIGHTS AND OBLIGATIONS OF MEMBERS; MEETINGS

6.01   <u>No Liability to Third Parties</u>.  Each Member's liability to third parties shall be limited as set forth in the New Jersey Act.

6.02   <u>Liability for Certain Acts</u>.  No Member has guaranteed nor shall any Member have any obligation with respect to the return of a Member's Capital Contributions or profits from the operation of the Company.

6.03   <u>Indemnity of Members</u>.  To the fullest extent permitted under the New Jersey Act, the Company may indemnify the Members and make advances for expenses to them with respect to their duties (including fiduciary duties) and liabilities arising out of or connected with their respective capacities as Members.

6.04   <u>List of Members</u>.   Upon written request of any Member, the Manager shall provide a list showing the names, addresses and Percentage Interest of all Members and the Manager and the other information required by the New Jersey Act

6.05   <u>Priority and Return of Capital</u>.  Except as may be expressly provided in Sections 8.01, 8.02 and 12.04, no Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions.  This Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

6.06   <u>Members Have No Exclusive Duty to Company</u>.  The Members may have other business interests and may engage in other activities in addition to those relating to the Company.   Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Member or to the income or proceeds derived therefrom.  No Member shall incur any liability to the Company or to any or the Members as a result of engaging in any other business or venture.

6.07    <u>Loans to Company</u>.  No Member shall be required to make any loans to the Company.  To the extent approved by Members holding a Majority Interest, the Members may be permitted to make loans to the Company if and to the extent they so desire and the Company requires such funds. The making of any loan by a Member shall not create any additional fiduciary duty as between the Member and the Company and shall not otherwise restrict the right to foreclose, or restrict any other legal remedies which may be exercised by the Member as may be provided to a third party creditor under law.

6.08    <u>No Annual or Other Meetings Required</u>.  No annual or other meetings of the Members shall be required, but the Members may meet from time to time as they desire in accordance with such procedures (if any) as the Manager may from time to time prescribe.

6.09    <u>Action by Consent</u>.  All actions which may be taken at a meeting of the Members or Manager may be taken without a meeting if the action is taken without a meeting by Members or Manager, as the case may be, representing the voting power to cast not less than the minimum number of votes necessary to authorize such action if taken at a meeting at which all Members or the Manager, as the case may be, entitled to vote were present and voted.

6.10    <u>No Requirements of Minutes</u>.  Although the Company may maintain books of minutes or other records of proceedings of the Company, neither the Manager, the Members nor the Company shall be required to maintain minutes of the Company or other records of its proceedings.

## ARTICLE VII
## <u>CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS</u>

No  Member shall be required to make any additional Capital Contributions.  To the extent approved by the Manager, the Members may be permitted to make additional Capital Contributions if and to the extent they so approved.

## ARTICLE VIII
## DISTRIBUTIONS TO MEMBERS

8.01    <u>Distributions of Net Cash from Operations.</u>  All distributions of available Net Cash from Operations shall be made at such times and in such amounts as the Manager may determine  to the Members in proportion to their Ownership Percentages.

8.02    <u>Net Cash from Sales or Refinancings</u>.  Distributions of Net Cash from Sales or Refinancings shall be made at such times and in such amounts as the Manager may determine to the Members in proportion to their Ownership Percentages.

8.03    <u>Limitation Upon Distributions</u>.  No distribution shall be made to Members if prohibited by the New Jersey Act.

# ARTICLE IX
## ALLOCATIONS

9.01    <u>Allocation of Net Profits and Net Losses</u>.  Subject to Section 9.05, the Net Profits and Net Losses of the Company attributable to each Allocation Year shall be determined as though the books of the Company were closed as of the end of such Allocation Year.  The rules of this Section 9.01 shall apply except as provided in Section 9.04 and subject to the intention set forth in Section 9.03:

(a)    For each Allocation Year, Net Profits or Net Losses (other than items allocated pursuant to Section 9.04) shall be allocated, insofar as possible, so that, following all allocations pursuant to Section 9.04 for such Allocation Year and the allocation pursuant to this Section 9.01 which is here being described, each Member's Capital Account balance shall be equal to the result (be it positive, negative or zero) of subtracting (i) the sum of (x) such Member's share of Company Minimum Gain and (y) such Member's share of Member Minimum Gain, from (ii) such Member's Target Amount (as defined below) at the end of such Allocation Year.

(b)    Except to the extent otherwise required by applicable law:  (i) in applying subsection (a), to the extent possible each item of income, gain, loss and deduction shall be allocated among the Members in the same proportions as each other such item, and, to the extent permitted by law, each item of credit shall be allocated in such proportions; and (ii) to the extent necessary to produce the result prescribed by subsection (a), items of income and gain shall be allocated separately from items of loss and deduction, in which event the proportions applicable to items of income and gain shall (to the extent permitted by law) be applicable to items of credit.

(c)    If, for any Allocation Year, (i) clause (b)(ii) does not apply and (ii) the aggregate of all items of income, gain, loss and deduction (other than those to be allocated pursuant to Section 9.04) is zero, then, except to the extent otherwise required by applicable law, all such items, and (to the extent permitted by law) all items of credit, shall be allocated among the Members in proportion to their respective Ownership Percentages as in effect throughout such Allocation Year.

(d)    For these purposes, the "Target Amount" of a Member at the end of any Allocation Year means the amount which such Member would then be entitled to receive if, immediately following such Allocation Year:  (i) all of the assets of the Company were sold for cash equal to their respective book values (or, in the case of assets subject to liabilities for which the creditor's right is limited to assets of the Company, the amounts of such liabilities, if greater than the aggregate book values of such assets); and (ii) the proceeds of such sale were applied to pay all debts of the Company with the balance distributed as provided in Section 8.02.

9.02    <u>Limitation on Loss Allocations.</u>  Notwithstanding anything in this Operating Agreement to the contrary, no loss or item of deduction shall be allocated to a Member if such allocation would cause such Member to have an Adjusted Capital Account Deficit as of the last day of the Allocation Year or other period to which such allocation relates.  Any amounts not

allocated to a Member pursuant to the limitations set forth in this paragraph shall be allocated to the other Members to the extent possible without violating the limitations set forth in this paragraph, and any amounts remaining to be allocated shall be allocated among the Members in proportion to their Ownership Percentages.

9.03   <u>Intention and Construction of Allocations.</u>   It is the intention of the Members to allocate Net Profits and Net Losses in such a manner as to cause each Member's Capital Account (as adjusted by the adjustments noted in clauses (i) and (ii) of the definition of "Adjusted Capital Account Deficit") to always equal the amount of cash such Member would be entitled to receive if the Company sold its assets for their respective book values and, after satisfying all Company liabilities, the proceeds from such sale, as well as all other funds of the Company, were then distributed to the Members pursuant to Section 8.02.  These provisions shall be so interpreted as necessary to accomplish such result.

9.04   <u>Special Allocations.</u>   The following special allocations shall be made in the following order.

(a)   <u>Minimum Gain Chargeback.</u>  Except as otherwise provided in Regulations Section 1.704-2(f), and notwithstanding any other provision of this Article IX, if there is a net decrease in Company Minimum Gain during any Company Allocation Year, each Member shall be specially allocated items of Company income and gain for that fiscal year (and, if necessary subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.4(a) is intended to comply with the Minimum Gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)   <u>Member Minimum Gain Chargeback.</u>  Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, and notwithstanding any other provisions of this Article IX, if there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Sections 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 7.4(b) is intended to comply with the Minimum Gain chargeback requirement of Regulations Section 1.704-2(i)(4), and shall be interpreted consistently therewith.

(c)   <u>Qualified Income Offset.</u>  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4),

1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 9.04 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.04 were not in the Operating Agreement.

(d)    Gross Income Allocation.  In the event any Member has an Adjusted Capital Account Deficit at the end of any Allocation Year, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.04 shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VII have been made as if this Section 9.04 were not in the Operating Agreement.

(e)    Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Sections 1.704-2(i)(1).

(f)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or (4), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interest in the Company in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(g)    Nonrecourse Deductions.  Nonrecourse Deductions for any year or other period shall be allocated to the Members, pro rata, based upon their respective Ownership Percentages as set forth herein.

(h)    Allocations Relating to Taxable Issuance of Ownership Interest.  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest by the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together will all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

9.05    Other Allocation Rules.

(a)    For purposes of determining the Net Profits, Net Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a

daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(b)     Except as otherwise provided in this Operating Agreement, all items of Company income, gain, loss, deduction, credit and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Net Profits or Net Losses, as the case may be, for the year.

(c)     The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

9.06    Tax Allocations; Code Section 704(c).

(a)     Except as otherwise provided in this Section 9.06, each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under this Article IX.  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using the allocation method determined by the Manager.

(b)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)     Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement, provided that any items of loss or deduction attributable to property contributed by a Member shall, to the extent of an amount equal to the excess of (A) the federal income tax basis of such property at the time of its contribution over (B) the Gross Asset Value of such property at such time, be allocated in its entirety to such contributing Member and the tax basis of such property for purposes of computing the amounts of all items allocated to any other Member (including a transferee of the contributing Member) shall be equal to its Gross Asset Value upon its contribution to the Company.

## ARTICLE X
## TRANSFERABILITY

10.01  General.  Except as set forth in Section 10.03, Section 10.04 and Section 10.05, without the prior written approval of  the Manager, no Member shall have the right to:

- 15 -

(a)    sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

(b)    gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law), all or part of his, her or its  Economic Interest or Ownership Interest.

10.02    <u>Successors as to Economic Rights</u>.  References in this Operating Agreement to Members shall also be deemed to constitute a reference to Economic Interest owners where the provision relates to economic rights and obligations.  By way of illustration and not limitation, such provisions would include those regarding Capital Accounts, distributions, allocations and contributions.  A transferee shall succeed to the transferor's Capital Contributions and Capital Account to the extent related to the Economic Interest transferred, regardless of whether such transferee becomes a Member.

10.03    <u>Purchase upon Termination</u>.  The parties acknowledge and agree that the Manager may terminate and remove any Employee Member (the "Terminated Member") at any time (i) for Cause or (ii) if such Member ceases to provide services to the Company on a full-time basis for any reason or for no reason (either event, a "Termination") (including but not limited to, death, Disability or resignation and whether terminated by the Manager or by such Member) and the Company and the other Members shall have the right and option to purchase all, but not less than all, of the Units (hereinafter referred to as the "Offered Units") owned by the Terminated Member in accordance with the terms and conditions set forth in this Section 10.03, and upon the exercise of such option, the Terminated Member and his heirs, successors or assigns (hereinafter referred to as the "Offering Member") shall be obligated to sell to the Company or to the other Members, all of the Offered Units in accordance with the terms and conditions set forth in this Section 10.03.

(a)    <u>Company's Option to Purchase</u>. Upon the Termination of a Member, the Company shall have the first option to purchase all, but not less than all, of the Offered Units for the price and in accordance with the terms set forth in this Section 10.03. If the Company desires to exercise its option to purchase all, but not less than all, of the Offered Units pursuant to this Section 10.03(a), the Company shall notify the Offering Member and the other Members in writing within forty-five (45) days after the date of Termination, that the Company is exercising its option to purchase all of the Offered Units pursuant to the terms and conditions hereof. The closing of a purchase and sale of the Offered Units pursuant to this Section 10.03(a) shall occur at a reasonable time and place selected by the Company, which in no event shall be later than the date thirty (30) days after the date of expiration of the forty-five (45) day period during which the Company had the option to purchase all of the Offered Units in accordance with this Section 10.03(a).

(b)    <u>Other Members' Option to Purchase</u>. If the Company fails or is unable to exercise its option to purchase all of the Offered Units, then the other Members shall have the option to purchase their Proportionate Share (or other mutually agreeable portion), of the Offered Units for the purchase price and in accordance with the terms set forth in this Section 10.03. If any or all of the other Members desire to exercise their option to purchase their Proportionate Share (or other mutually agreeable portion) of the Offered Units, such other Members shall notify the Offering Member, the Company and the other Members in writing within forty-five (45) days after the date of

expiration of the forty-five (45) day period specified in Section 10.03(a) above during which the Company had the option to purchase all of the Offered Units that such Member is exercising his option to purchase his Proportionate Share (or other mutually agreeable portion) of the Offered Units. The closing of a purchase and sale of the Offered Units pursuant to this Section 10.03(b) shall occur at a reasonable time and place selected by a majority of the Members who elect to purchase their Proportionate Share (or other mutually agreeable portion) of the Offered Units, which in no event shall be later than the date thirty (30) days after the date of expiration of the forty-five (45) day period during which the Members had the option to purchase their Proportionate Share (or other mutually agreeable portion) of the Offered Units pursuant to this Section 10.03(b).

(c)    <u>Failure to Exercise Option</u>. If the Company and the other Members fail to exercise their respective options to purchase the Offered Units pursuant to this Section 10.03, the Offering Member shall be permitted to retain the Offered Units and shall remain subject to all the terms and conditions of this Agreement, but such Offering Member shall be an Economic Interest owner and not a Member.

(d)    <u>Purchase Price</u>.  The Offered Units shall be purchased for a price equal to the Agreed Value.  If the Termination is for "Cause", then the Offered Units shall be purchased for a price equal to fifty percent (50%) of the Agreed Value.

(e)    <u>Installment Payments</u>.  The purchase price for a Terminated Member's Units shall be paid to the Terminated Member at closing by the delivery of a promissory note made by the purchaser(s) (the "Purchase Note").  The Note shall bear interest at a rate equal to the prime rate as published in the Wall Street Journal on the business day prior to the closing and shall be payable in equal monthly installments of principal and interest with the first installment being due on the first day of the month following the date of the closing. The term of the Note shall be for sixty (60) months (or 120 months if it is for Units acquired from a Member terminated for Cause).

10.04    Unauthorized Transfers.

(a)    Upon any completed or attempted sale, transfer, pledge, gift, encumbrance or other disposition of any Units in violation of the provisions of this Operating Agreement, whether voluntary or involuntary, in addition to any other remedies available at law or in equity, the Company shall have the right and option to purchase all or any part of the Units transferred (or attempted to be transferred) in violation of this Operating Agreement (hereinafter referred to as the "Transferred Units") in accordance with the terms and conditions set forth in this Section 10.04, and upon exercise of such option, the holder of the Units transferred (or attempted to be transferred) in violation of this Agreement (hereinafter referred to as the "Holder") shall be obligated to sell the Transferred Units to the Company in accordance with the terms and conditions set forth in this Section 10.04.

(b)    Upon the completed or attempted transfer of any Units in violation of the provisions of this Operating Agreement, the Company shall have the option to purchase all or any portion of the Transferred Units for a price equal to fifty percent (50%) of the Agreed Value, or if the Transferred Units were transferred (or attempted to be transferred) by sale or exchange (as

opposed to a gratuitous transfer), at the option of the Company, for the price and in accordance with the terms for which such Units were sold or exchanged (or attempted to be sold or exchanged) in violation of the provisions of this Operating Agreement. If the Company desires to exercise its option to purchase all or any portion of the Transferred Units pursuant to this Section 10.04, the Company shall notify the Holder in writing within two (2) years after the date the Company has actual notice of the transfer (or attempted transfer) in violation of the provisions of this Operating Agreement: (i) that the Company is exercising its option to purchase the Transferred Units; (ii) the number of the Transferred Units it intends to purchase; and (iii) whether it intends to purchase the Transferred Units (or portion thereof) for the price and in accordance with the terms for which such Transferred Units were sold or exchanged (or attempted to be sold or exchanged) in violation of the provisions of this Operating Agreement or for a price equal to fifty percent (50%) of the Agreed Value. The closing of a purchase and sale of the Transferred Units (or a portion thereof) pursuant to this Section 10.04 shall occur at a reasonable time and place selected by the Company, which in no event shall be later than the date ninety (90) days after the date of notice from the Company to the Holder that the Company is exercising its option to purchase the Transferred Units pursuant to this Section 10.04.  The Holder shall be paid in installments as provided in Section 10.03(e).

10.05   <u>Drag Along Rights</u>.  If at any time after the date hereof, Members holding a Majority Interest  (the "Transferring Members") desire to transfer in a bona fide arm's-length sale to Persons who are unrelated third parties (for purposes of this Section 10.05, collectively, the "Proposed Transferee") all or any portion of his, her or its Units, whether in a single transaction or in a series of related transactions, then the Transferring Members shall have the right (the "Drag-Along Right") to require all Members which are not Transferring Members (collectively, the "Other Members") to sell to the Proposed Transferee that percentage of his, her or its Units that is proportionate to the percentage of Units of the Company to be transferred by the Transferring Members to the percentage of Units of the Company held by the Transferring Members.  Each Member shall receive in exchange for his, her or its Units being sold the same portion of the aggregate consideration from such sale that such Member would have received if such aggregate consideration had been distributed by the Company pursuant to Section 8.02 (the "Drag-Along Price").  The Transfer of Units in connection with the exercise of the Drag-Along Right is referred to herein as a "Covered Transfer".  To exercise the Drag-Along Right, the Transferring Members shall give the Other Members notice, delivered not less than 20 days prior to the consummation of the proposed Covered Transfer, containing (i) the name and address of the Proposed Transferee, (ii) the terms and conditions of the proposed Covered Transfer and (iii) the Drag-Along Price (based on a reasonable estimate of transaction costs, escrows and closing adjustments).  In connection with a Covered Transfer, the Other Members will, if requested by the Proposed Transferee, execute, deliver and perform agreements with the Proposed Transferee relating to the sale containing terms that are no more onerous in any respect than those contained in the agreements to be executed, delivered and performed by the Transferring Members.

## ARTICLE XI
## ADDITIONAL MEMBERS

From the date of the formation of the Company, any Person or Entity acceptable to the

Manager by may become a Member of this Company either by the issuance by the Company of Ownership Interests for such consideration as the Manager thereof shall determine, or as a transferee of a Member's Ownership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement.  No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company.  The Manager may, at his option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of 706(d) of the Code and the Treasury Regulations promulgated thereunder.

**ARTICLE XII**
**<u>DISSOCIATION, DISSOLUTION AND TERMINATION</u>**

12.01   <u>Dissociation</u>.

(a)   Notwithstanding anything to the contrary contained in the New Jersey Act, a Member shall   cease to be a member of the Company only upon the occurrence of one of the following events:

(i)   the Member assigns all of his Ownership Interest or Economic Interest in accordance with Article 11 herein;

(ii)   the Member's entire Ownership Interest in the Company is purchased or redeemed by the Company; or

(iii)   the Member dies.

(b)   Except as otherwise expressly permitted in this Agreement, a Member shall not withdraw from the Company or take any other action which causes such Member to withdraw from the Company.  A Member who withdraws (a "Withdrawing Member") shall not be entitled to receive any distributions to which such Member would not have been entitled had such Member remained a Member, and such distributions shall be distributable to such Member only at the time (if any) such distributions would have been made had the Withdrawing Member remained a Member.

12.02   <u>Dissolution</u>.  The Company shall be dissolved only upon the occurrence of one or more of the following events:

(a)   the written consent of Members holding a Majority Interest; or

(b)   there is an administrative or judicial decree of dissolution;

12.03   <u>Effect of Dissolution</u>. Upon dissolution, the Company shall cease to carry on its business, except as permitted by the New Jersey Act.

- 19 -

12.04    Winding Up, Liquidation and Distribution of Assets.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind),

(ii)    Allocate any profit or loss resulting from such sales to the Members in accordance with Article IX hereof,

(iii)    Discharge all liabilities of the Company, including liabilities to Members who are creditors, to the extent otherwise permitted by law, other than liabilities to Members for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent or other liabilities of the Company,

(iv)    Distribute the remaining assets in the following order:

(1)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(2)    The balance, if any, to the Members, in accordance with Section 8.02.

(c)    Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

# ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.01   <u>Application of New Jersey Law</u>.  This Operating Agreement and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of New Jersey, and specifically the New Jersey Act.

13.02   <u>Heirs, Successors and Assigns</u>.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

13.03   <u>Creditors</u>.  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

13.04   <u>Counterparts</u>.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.05   <u>Federal Income Tax Elections</u>.  All elections required or permitted to be made by the Company under the Code shall be made by the Manager as determined in it sole discretion. For all purposes permitted or required by the Code, the Members constitute and appoint Holdings as Tax Matters Partner or such other Member as shall be designated by a Majority Interest of the Members.

13.06   <u>Notices</u>.  Any and all notices, offers, demands or elections required or permitted to be made under this Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (a) when hand-delivered (either in person by the party giving such notice, or by his or her designated agent, or by commercial courier) or (b) on the third (3rd) business day (which term means a day when the United States Postal Service, or its legal successor ("Postal Service") is making regular deliveries of mail on all of its regularly appointed week-day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such Notice is deposited, postage pre-paid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth on Exhibit A, or at such other address as the other party may hereafter designate by Notice.

13.07   <u>Amendments</u>.  Any amendment to this Operating Agreement shall be made in writing and signed by Members holding a Majority Interest.

13.08   <u>Invalidity</u>.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and the Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.  If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, the

Georgia Act shall control and such invalid or unenforceable provisions shall not affect or invalidate the other provisions hereof, and this Agreement shall be construed in all respects as if such conflicting provision were omitted.

13.09  <u>Dissenters' Rights</u>. The Members hereby waive any dissenters' or appraisal rights.

**SIGNATURES APPEAR ON THE FOLLOWING PAGE**

       **IN WITNESS WHEREOF,** this Agreement has been signed, sealed and delivered as of this ___ day of _____, 2015

<u>**MANAGER:**</u>

FACTEON HOLDINGS LLC

By:_____(SEAL)
Name:_____
Title:_____

<u>**MEMBERS**</u>:

FACTEON HOLDINGS LLC

By:_____(SEAL)
Name:_____
Title:_____

_____
Steven Howell

_____
Patrick Delaney

_____
Noel Capon

_____
Paul Capon

K:\9178\1\PLAN DOX-FINAL\Exhbits\amended and restated operating agreement (Comply First LLC)(09.10.15).docx

<u>EXHIBIT A</u>
MEMBERS

|  | <u>Address</u> | <u>Ownership Percentage</u> | <u>Units</u> |
|---|---|---|---|
| Facteon Holdings LLC | 700 Galleria Parkway Suit <u>Members</u> e 440 Atlanta, GA  0339 | 80% | 800 |
| Howell | 397 Smith Ave. Islip, NY 11751 | 10% | 100 |
| Delaney | 9 Ivy Trail, N.E. Atlanta, GA 30342 | 6% | 60 |
| Noel Capon | 333 Riverside Drive New York, NY 10025 | 3% | 30 |
| Paul Capon | 333 Riverside Drive New York, NY 10025 | 1% | 10 |

**EXHIBIT C**

**LIST OF EXECUTORY CONTRACTS AND UNEXPIRED LEASE TO BE ASSUMED**

**NONE**